# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 09-1578

_____

| | | |
|---|---|---|
| Gregory Wersal, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Patrick D. Sexton, in his official | * | |
| capacity as Chair of the Minnesota | * | |
| Board of Judicial Standards; William J. | * | |
| Egan, in his official capacity as a | * | |
| Member of the Minnesota Board of | * | Appeal from the United States |
| Judicial Standards; Douglas A. Fuller, | * | District Court for the |
| in his official capacity as a Member of | * | District of Minnesota. |
| the Minnesota Board of Judicial | * | |
| Standards; Jon M. Hopeman, in his | * | |
| official capacity as a Member of the | * | |
| Minnesota Board of Judicial Standards; | * | |
| Cynthia Jepsen, in her official capacity | * | |
| as a Member of the Minnesota Board of | * | |
| Judicial Standards; E. Anne McKinsey, | * | |
| in her official capacity as a Member of | * | |
| the Minnesota Board of Judicial | * | |
| Standards; Gary Pagliaccetti, in his | * | |
| official capacity as a Member of the | * | |
| Minnesota Board of Judicial Standards; | * | |
| James Dehn, in his official capacity as a | * | |
| Member of the Minnesota Board of | * | |
| Judicial Standards; Kent A Gernarder, | * | |
| in his official capacity as Chair of the | * | |
| Minnesota Lawyers Professional | * | |
| Responsibility Board; Vincent A. | * | |

Thomas, in his official capacity as Vice   *

Chair of the Minnesota Lawyers   *

Professional Responsibility Board;   *

Kathleen Clarke Anderson, in her   *

official capacity as a Member of the   *

Minnesota Lawyers Professional   *

Responsibility Board; Mark R. Anway,   *

in his official capacity as a Member of   *

the Minnesota Lawyers Professional   *

Responsibility Board; Robert B. Bauer,   *

in his official capacity as a Member of   *

the Minnesota Lawyers Professional   *

Responsibility Board; Joseph V.   *

Ferguson, III, in his official capacity as   *

a Member of the Minnesota Lawyers   *

Professional Responsibility Board;   *

Wood R. Foster, Jr., in his official   *

capacity as a Member of the Minnesota   *

Lawyers Professional Responsibility   *

Board; Susan C. Goldstein, in her   *

official capacity as a Member of the   *

Minnesota Lawyers Professional   *

Responsibility Board; Sherri D.   *

Hawley, in her official capacity as a   *

Member of the Minnesota Lawyers   *

Professional Responsibility Board;   *

Lynn J. Hummel, in her official   *

capacity as a Member of the Minnesota   *

Lawyers Professional Responsibility   *

Board; Geri L. Krueger, in her official   *

capacity as a Member of the Minnesota   *

Lawyers Professional Responsibility   *

Board; Ann E. Mass, in her official   *

capacity as a Member of the Minnesota   *

Lawyers Professional Responsibility   *

Board; Mary L. Medved, in her official   *

capacity as a Member of the Minnesota   *

Lawyers Professional Responsibility    *
Board; David A. Sasseville, in his    *
official capacity as a Member of the    *
Minnesota Lawyers Professional    *
Responsibility Board; Debbie    *
Toberman, in her official capacity as a    *
Member of the Minnesota Lawyers    *
Professional Responsibility Board;    *
Dianne A. Ward, in her official capacity    *
as a Member of the Minnesota Lawyers    *
Professional Responsibility Board;    *
Stuart T. Williams, in his official    *
capacity as a Member of the Minnesota    *
Lawyers Professional Responsibility    *
Board; Jan M. Zender, in her official    *
capacity as a Member of the Minnesota    *
Lawyers Professional Responsibility    *
Board; William P. Donohue, in his    *
official capacity as a Member of the    *
Minnesota Lawyers Professional    *
Responsibility Board; Marne Gibbs    *
Hicke, in her official capacity as a    *
Member of the Minnesota Lawyers    *
Professional Responsibility Board;    *
Richard H. Kyle, Jr., in his official    *
capacity as a Member of the Minnesota    *
Lawyers Professional Responsibility    *
Board; Michael W. Unger, in his    *
official capacity as a Member of the    *
Minnesota Lawyers Professional    *
Responsibility Board; Daniel R.    *
Wexler, in his official capacity as a    *
Member of the Minnesota Lawyers    *
Professional Responsibility Board;    *
Randy R. Staver, in his official capacity    *
as a Member of the Minnesota Board    *
of Judicial Standards; Honorable Terri    *

Stoneburner, in her official capacity as   *
a Member of the Minnesota Board of   *
Judicial Standards,   *
  *
      Appellees.   *

_____

Submitted: January 10, 2011
Filed: March 27, 2012

_____

Before RILEY, Chief Judge, and WOLLMAN, BEAM, LOKEN, MURPHY, BYE, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, En Banc.

_____

BYE, Circuit Judge, with whom MURPHY, MELLOY, SMITH, and SHEPHERD, Circuit Judges, join.

Gregory Wersal, a candidate for Justice of the Minnesota Supreme Court, filed an action challenging three provisions of the Minnesota Code of Judicial Conduct—the "endorsement," "personal solicitation," and "solicitation for a political organization or candidate" clauses—as unconstitutionally infringing on the First Amendment rights of judicial candidates. After the parties filed cross-motions for summary judgment, the district court[1] denied Wersal's motion and granted summary judgment in favor of the members of the Minnesota Board of Judicial Standards and the Minnesota Lawyers Professional Responsibility Board. On appeal, a divided panel of this court reversed, Wersal v. Sexton, 613 F.3d 821 (8th Cir. 2010), concluding the clauses failed strict scrutiny. We granted the Appellee's petition for en banc review, and we now affirm the district court's decision upholding the constitutionality of the challenged clauses.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

# I

## A.  Wersal's Previous Bids for a Seat on the Minnesota Supreme Court

Since its inception, Minnesota has utilized popular elections to select the judges of its courts.  Minn. Const. art. 6, § 7.  To govern these elections, the Minnesota Supreme Court promulgated certain restrictions contained in the Minnesota Code of Judicial Conduct ("Code").  Over the years, Gregory Wersal has challenged particular prohibitions of the Code in connection with his bids for various seats on the Minnesota Supreme Court, which has resulted in two cases lying at the genesis of the instant matter.

In 1996, Wersal ran for a seat as an associate justice.  At the time, he sought the endorsement of the Republican Party of Minnesota, attended and spoke at party gatherings, and solicited campaign contributions.  As a result of these activities, ethical complaints were filed with the Minnesota Lawyers Professional Responsibility Board, alleging Wersal had violated the Code by stating his views on disputed legal and political issues and seeking the endorsement of a political party.  While the complaints were ultimately dismissed, Wersal withdrew as a candidate from the race.

In his second bid for a seat on the court in 1998, Wersal again spoke at political conventions and sought the Minnesota Republican Party's endorsement.  That year, Wersal sought an advisory opinion from the Minnesota Office of Lawyers Professional Responsibility, asking whether he would be subject to ethical violations for speaking at party gatherings, seeking the party's endorsement, and announcing his views on disputed issues.  Wersal, along with others, subsequently filed suit seeking to invalidate the relevant provisions of the Code as violative of his First Amendment rights.  Although the district court and this court both upheld the validity of the challenged clauses, Republican Party of Minn. v. Kelly, 247 F.3d 854 (8th Cir. 2001), the Supreme Court granted certiorari on the issue of whether the announce clause

violated the First Amendment, and reversed.  Republican Party of Minn. v. White, 536 U.S. 765 (2002) (White I).

B.  The Supreme Court's Decision in White I

In White I, the Supreme Court considered the constitutionality of the announce clause, which stated a candidate for judicial office "shall not 'announce his or her views on disputed legal or political issues.'"  536 U.S. at 768 (quoting Minn. Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2000)).  Because the clause was content-based, the Court examined it under strict scrutiny, asking whether the State met its burden to show the clause was "(1) narrowly tailored, to serve (2) a compelling state interest."  White I, 536 U.S. at 774-75.  The State offered two interests, both of which this court previously recognized as compelling: "preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary."  Id. at 775.  In examining the asserted interests, the Court explored three potential definitions of "impartiality."  Id.

The first possible meaning of "impartiality," identified by the Court as the word's "root meaning," is "the lack of bias for or against either *party* to the proceeding," which "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party."  Id. at 775-76 (emphasis in original).  The Court concluded the announce clause was not narrowly tailored to serve the asserted interests in this sense because "it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*."  Id. at 776 (emphasis in original).

The second meaning of "impartiality" recognized by the Court is a "lack of preconception in favor of or against a particular *legal view*."  Id. at 777 (emphasis in original).  This uncommon use of the word could not be a compelling interest, the Court resolved, because a judge's lack of predisposition on legal issues "has never

been thought a necessary component of equal justice[.]" Id. The Court further reasoned it would actually be undesirable to have judges who did not have preconceived views on legal issues, because this lack of introspection indicates a lack of qualification for the position. Id. at 778.

Finally, the Court discussed a third possible meaning of "impartiality," which it described as "open-mindedness," whereby a judge remains willing to consider views contrary to his or her preconceptions and remain open to persuasion. Id. The Court found the announce clause unsupported by this asserted purpose:

> In Minnesota, a candidate for judicial office may not say "I think it is constitutional for the legislature to prohibit same-sex marriages." He may say the very same thing, however, up until the very day before he declares himself a candidate, and may say it repeatedly (until litigation is pending) after he is elected. As a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous.

Id. at 779-80. Thus, the Court concluded the announce clause was "woefully underinclusive, prohibiting announcements by judges (and would-be judges) only at certain times and in certain forms." Id. at 783. In sum, no matter how "impartiality" is defined, the Court held the announce clause was not narrowly tailored to the State's asserted interests in maintaining the impartiality of the judiciary. Id. at 788.

C. This Court's Decision in White II

On remand from White I, after a divided panel of this court affirmed with regard to Wersal's remaining challenges to the partisan-activities and solicitation clauses, Republican Party of Minn. v. White, 361 F.3d 1035 (8th Cir. 2004), we granted en banc review and vacated the panel opinion. Ultimately, we sustained

Wersal's remaining challenges and concluded the partisan-activities and solicitation clauses violated the First Amendment. Republican Party of Minn. v. White, 416 F.3d 738 (8th Cir. 2005) (en banc) (White II).

In White II, we first considered Wersal's challenge to the partisan-activities clause, which stated "a judge or a candidate for election to judicial office shall not . . . identify themselves as members of a political organization, except as necessary to vote in an election; . . . attend political gatherings; or seek, accept or use endorsements from a political organization." Id. at 745 (quoting 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. A(1)(a), (d)). At the outset, we recognized Minnesota's compelling interest in protecting litigants from biased judges. Id. at 754. However, closely tracking the reasoning of White I, we held the clause was not narrowly tailored to serve the State's interest under this particular meaning of judicial impartiality. Id. We reasoned that association is itself an important form of speech and, to the extent association is a proxy for the expression of ideas and the alignment with particular views, "the clause is likewise 'barely tailored' to affect any interest in impartiality toward parties." Id. Further, in the case of parties coming before a judge who associated with that party, we noted, "any credible claim of bias would have to flow from something more than the bare fact that the judge had associated with that political party," because the associational restrictions are "part-and-parcel of a candidate's speech for or against particular *issues* embraced by the political party." Id. at 755 (emphasis in original). Finally, if cases arose where the partisan activities raised more than an inference of bias, we concluded the problem could be solved through the less-restrictive means of recusal. Id.

We also addressed the meaning of "impartiality" articulated by White I as "open-mindedness" in the context of the partisan-activities clause. Id. at 756. Like the announce clause considered by the Supreme Court, we concluded the partisan-activities clause was "woefully underinclusive" because the clause was not adopted for the purpose of protecting judicial open-mindedness and the clause's

underinclusiveness betrayed the claim that it was compelling. Id. On the latter point, we discussed how it made little sense for Minnesota to restrict associational activities to only political parties, while not restricting a judicial candidate's association with varying political interest groups. Id. at 759-60. In sum, we concluded the partisan activities clause was not narrowly tailored to any compelling state interest, and therefore violated the First Amendment. Id. at 760.

We proceeded to consider the constitutionality of certain provisions of the solicitation clause, which barred candidates from "personally soliciting individuals or even large gatherings for campaign contributions." Id. at 763. The Code permitted a candidate to solicit donations through his campaign committee, and prohibited the candidate from learning the identity of any person to whom a solicitation was made. Id. at 745. Wersal challenged two components of this system: first, he asserted a right to solicit contributions from large groups; second, he challenged a provision of the Code barring campaign committees from using the candidate's signature on written solicitations. Id. at 765.

We first recognized the prohibition on direct personal solicitation "certainly addresses a compelling state interest in impartiality as to parties to a particular case." Id. However, in striking down the challenged provisions, we determined the solicitation clause did not serve an interest in impartiality in the sense of preventing a lack of bias for or against a party to a case, because the Code specifically provided the contributions would be made to the candidate's committee, and the candidate could not learn the identity of the donors. Id. In this sense, we reasoned the candidate would not be able to deduce who contributed to his or her campaign, and thus the blanket ban did not advance an interest in impartiality. Id. at 765-66. Accordingly, we concluded the challenged portions of the solicitation clause were "barely tailored" to the State's interest in maintaining an impartial judiciary. Id. at 765. We likewise concluded the solicitation clause "seems barely tailored to in any

way affect the open-mindedness of a judge." Id. at 766. Therefore, we held the solicitation clause violated the First Amendment. Id.

D. The Aftermath of White I and White II

In the wake of White I and White II, the Minnesota Supreme Court promulgated an amended version of the Code in response to the rulings. Specifically, the court eliminated the announce clause and revised the solicitation clause to allow candidates to solicit contributions if they spoke to an audience of 20 or more persons, and to allow campaign committees to use solicitation letters signed by the candidate.

In early 2007, Wersal announced his candidacy for Chief Justice of the Minnesota Supreme Court, running against then-Chief Justice Russell Anderson. As part of his campaign, Wersal wished to publicly endorse certain candidates for public office in 2008, including Tim Tinglestad, who ran against Justice Paul Anderson for the position of Associate Justice; Glen Jacobsen, a candidate for a judgeship in Minnesota District Court; and Michele Bachmann, a congresswoman from Minnesota's Sixth District who ran for re-election. Wersal desired to publicly voice his support for the candidates through public statements, yard signs, phone calls, endorsement letters, and letters to potential contributors. However, he did not engage in any of these activities in fear of violating the Code. In addition, Wersal desired to personally solicit funds for his own campaign by going door-to-door and making personal phone calls. Again, Wersal refrained from engaging in this behavior for fear of violating the relevant ethical rules placed on judicial candidates.

On March 3, 2008, Wersal filed suit against every member of the Minnesota Board of Judicial Standards and Minnesota Lawyers Professional Responsibility Board in his or her official capacity (referred to collectively as "Minnesota"), challenging the constitutionality of Canons 5A(1)(b), 5A(1)(d), and 5B(2) (2008). On July 1, 2009, the Minnesota Supreme Court adopted a revised version of the Code.

Canon 5A(1)(b) became Rule 4.1(A)(3); the new rule, which states a judge or judicial candidate shall not "publicly endorse or, except for the judge or candidate's opponent, publicly oppose another candidate for public office," is identical to the old rule. Former Canon 5A(1)(d) is now Rule 4.1(A)(4); the new rule, which provides a judge or judicial candidate shall not "solicit funds for a political organization or a candidate for public office, or make a contribution to a candidate for public office," was changed slightly from the old rule. Finally, Canon 5B(2) has been divided into two new rules which do not differ in substance from the canon they replaced. Rule 4.1(A)(6) bars judges and judicial candidates from "personally solicit[ing] or accept[ing] campaign contributions other than as authorized by Rules 4.2 and 4.4." Rule 4.2(B)(3)(a) permits a judge or judicial candidate to "make a general request for campaign contributions when speaking to an audience of 20 or more people." In addition, Rule 4.2(B)(3)(c) permits a judge or judicial candidate to "personally solicit campaign contributions from members of the judge's family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority." However, no rule permits what Wersal seeks: to personally solicit campaign contributions by walking door-to-door and making phone calls.[2]

On March 10, 2008, then-Chief Justice Russell Anderson retired. Governor Tim Pawlenty appointed Eric Magnuson to replace Anderson on March 17, 2008. Due to the timing of the appointment, Chief Justice Magnuson was not required to face election until 2010. Although Wersal contemplated running against Associate Justice Paul Anderson, he ultimately refrained from running for any seat in 2008. At the time of the district court proceedings and initial appeal, Wersal stated he intended to run again for a seat on the Minnesota Supreme Court in 2010.[3]

---

[2]We refer to the current version of the rules in the remainder of this opinion.

[3]Wersal did in fact run against Associate Justice Helen Meyer for a seat in 2010, but he was unsuccessful in his bid.

Before the district court, Wersal and the defendants brought cross-motions for summary judgment, and the district court denied Wersal's motion and granted the defendants' motion. First, the district court concluded Wersal's challenge to Rule 4.1(A)(4)(a), the solicitation for political organization or candidate clause, was not ripe. Next, the district court upheld the endorsement clause under strict scrutiny, concluding the clause was narrowly tailored to Minnesota's interests in maintaining impartiality and maintaining the appearance of impartiality. Finally, the district court upheld the personal solicitation clause, holding the clause was narrowly tailored to meet Minnesota's interest in maintaining judicial impartiality. In sum, the district court rejected all of Wersal's challenges to the Code. On appeal, a divided panel of this court reversed the district court. We granted en banc review, and now proceed to consider the constitutionality of the challenged provisions.

II

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Quinn v. St. Louis County, 653 F.3d 745, 750 (8th Cir. 2011). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir. 2011).

A. The Ripeness of Wersal's Challenge to Rule 4.1(A)(4)(a)[4]

We first address the ripeness of Wersal's challenge to Rule 4.1(A)(4)(a), which prohibits a judge or judicial candidate from "solicit[ing] funds for a political organization or a candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a). "The ripeness doctrine is aimed at preventing federal

---

[4]Judge Colloton, Judge Gruender, and Judge Benton join only Part II.A. of this opinion.

-12-

courts, through premature adjudication, from 'entangling themselves in abstract disagreements.'" Citizens for Equal Protection v. Bruning, 455 F.3d 859, 863 (8th Cir. 2006) (quoting Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 580 (1985)). "Ripeness is demonstrated by a showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the operation of the challenged [action], and that the injury would be redressed by the relief requested." Employers Ass'n, Inc. v. United Steelworkers, 32 F.3d 1297, 1299 (8th Cir. 1994).

Before the district court, Wersal argued Rule 4.1(A)(4)(a) prevented him from soliciting funds for his own campaign, which was a "political organization" within the meaning of the rule. The district court rejected Wersal's interpretation, reasoning the rule only restricted the solicitation of funds for another candidate or another candidate's political organization because a different set of rules—now Rules 4.1(a)(6), 4.2, and 4.4—govern solicitations for a judicial candidate's own campaign. Therefore, the court concluded Wersal's claim lacked ripeness because he was unable to show he faced a "credible threat of prosecution" for violating the clause.

After the district court's decision, the Minnesota Supreme Court further clarified in an amendment, "[f]or purposes of this Code, the term [political organization] does not include a judicial candidate's campaign committee created as authorized by Rule 4.4." See Minn. Code of Judicial Conduct, Terminology, "Political organization" (2009). In an apparent recognition of the unsoundness of his "political organization" argument, Wersal now contends Rule 4.1(A)(4)'s ban on solicitation for "a candidate for public office" operates to prevent him from soliciting funds for his own campaign. We disagree.

As an initial matter, we agree with Wersal that he is a candidate for public office under the plain meaning of the phrase. However, our analysis does not end there. It is a basic tenet of construction that the Code must be construed as a whole so as to give effect to all provisions where possible, rather than rendering certain

-13-

provisions null or superfluous.  See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotation marks and citation omitted); see also Wintermute v. Kan. Bankers Sur. Co., 630 F.3d 1063, 1068 (8th Cir. 2011) ("A basic tenet of contract law is that each word in the agreement should be interpreted to have a meaning, rather than to be redundant and superfluous.") (internal quotation marks and citation omitted).

Employing this principle, we find illustrative Rule 4.4, which governs the establishment of a candidate's campaign committee as a distinct entity from the candidate himself.  Rule 4.4 "recognizes that judicial candidates must raise campaign funds to support their candidacies, and permits candidates . . . to establish campaign committees to solicit and accept contributions."  52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.4, cmt. 1.  The rule provides a buffer between the candidate and his campaign committee by instructing, for example, the candidate to direct his committee "not to disclose to the candidate the identity of campaign contributors[.]"  52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.4(B)(3).

Rule 4.4 is expressly referenced in the personal solicitation clause, which prohibits a candidate from personally soliciting campaign contributions "other than as authorized by Rules 4.2 and 4.4."  52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(6).  When reading these provisions together, it becomes clear Wersal is not barred from soliciting funds for his campaign committee, which is all he seeks to do for purposes of this clause.  Notably, Wersal does not challenge the provisions of the Code relating to campaign committees.  Under Wersal's reading of Rule 4.1(A)(4)(a), such provisions would be rendered superfluous, as recognized by the district court.  Given our reading of Rule 4.1(A)(4)(a), Wersal's challenge is not ripe because he only seeks to solicit funds for his own campaign committee—which he is permitted to do under the Code—and not for another's campaign, or himself

-14-

personally, and therefore he cannot show there is a likelihood he would face sanctions for engaging in his desired conduct. Thus, we affirm the district court's dismissal of this claim.

### B. Wersal's First Amendment Challenges

After concluding Wersal's challenge to Rule 4.1(A)(4) is not ripe, we proceed to consider his facial and as-applied constitutional challenges to the endorsement clause and the revised solicitation clause. Under the First Amendment, made applicable to the states, see McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336 n.1 (1995), "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Because the challenged clauses are content-based restrictions on political speech, we examine Wersal's challenges under strict scrutiny. White I, 536 U.S. at 774; see also Carey v. Wolnitzek, 614 F.3d 189, 198-200 (6th Cir. 2010) (applying strict scrutiny to a solicitation clause). But see Siefert v. Alexander, 608 F.3d 974, 983 (7th Cir. 2010) (applying a balancing test, rather than strict scrutiny, to evaluate an endorsement clause).[5] Under strict scrutiny, Minnesota bears the burden of proving the endorsement and solicitation clauses (1) advance a compelling state interest and (2) are narrowly tailored to serve that interest. White I, 536 U.S. at 774-75. We will consider each of these inquiries in turn.

---

[5]Minnesota does not argue we should apply anything less than strict scrutiny, even after Siefert was decided. See Response to Appellant's Supplemental Authority ("Under the reasoning in Siefert, Minnesota's endorsement clause would pass strict scrutiny."). Even if it had made this argument, we would not need to reach the issue, because we ultimately conclude the endorsement clause passes constitutional muster under the tougher strict scrutiny test.

1.  Compelling State Interest

As we recognized in <u>White II</u>, it is difficult to derive a precise definition of what constitutes a "compelling interest." 416 F.3d at 750. "In general, strict scrutiny is best described as an ends-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest." <u>Id.</u>

Minnesota asserts several compelling interests, including (1) maintaining judicial impartiality, defined as the lack of bias for or against either party to a proceeding; (2) maintaining the appearance of judicial impartiality; (3) promoting open-mindedness; (4) preventing candidates from abusing the prestige of judicial office; and (5) protecting the political independence of the judiciary. The first three of these asserted interests recall to mind the definitions of impartiality set forth by Justice Scalia in <u>White I</u>, which were expounded upon by our decision in <u>White II</u>. <u>See</u> <u>supra</u> Part I.B.

In harmony with <u>White I</u> and <u>White II</u>, we have little difficulty concluding Minnesota's interest in preserving impartiality, defined as the lack of bias for or against a party to a proceeding, is compelling. <u>See</u> <u>Siefert</u>, 608 F.3d at 981 ("Insofar as impartiality refers to 'the lack of bias for or against either *party* to the proceeding,' it is a compelling state interest.") (quoting <u>White I</u>, 536 U.S. at 775) (emphasis in original). "It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process." <u>Caperton v. A.T. Massey Coal Co.</u>, 129 S.Ct. 2252, 2259 (2009) (internal quotation marks and citation omitted); <u>see also</u> <u>Johnson v. Mississippi</u>, 403 U.S. 212, 216 (1971) (per curiam) ("Trial before 'an unbiased judge' is essential to due process.") (quoting <u>Bloom v. Illinois</u>, 391 U.S. 194, 205 (1968)). Indeed, in <u>White II</u>, we expressly recognized this meaning of impartiality constitutes a compelling state interest:

-16-

It can hardly be argued that seeking to uphold a constitutional protection, such as due process, is not per se a compelling state interest. And the rule laid down in [Tumey v. Ohio, 273 U.S. 510, 523 (1927)] makes clear that the partiality of a judge as it relates to a party to a case violates due process protections: "It certainly violates the Fourteenth Amendment, and deprives a person of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." In [Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)], the Court reiterated that "the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case."

416 F.3d at 753 (internal citation omitted).

However, much in the same way White I "implied . . . *this* meaning of impartiality describes a state interest that is compelling," id. (emphasis in original), White I and White II both implied preserving the *appearance* of impartiality constitutes a compelling interest, separate and distinct from the state interest in preventing actual bias. See White I, 536 U.S. at 776 (analyzing the tailoring of the announce clause to the state's interest in impartiality "or the appearance of impartiality"); White II, 416 F.3d at 755, 758-59 (discussing the tailoring of the partisan-activities clause as it related to Minnesota's interest in the appearance of impartiality).[6]   Nonetheless, we find it necessary to discuss the appearance of

_____

[6]Judge Beam's claim that we "seek[] to create from scratch" the interest in preserving the appearance of impartiality is perplexing, post at 58, given that this court previously concluded the interest was compelling. See Kelly, 247 F.3d at 867 ("The governmental interest in an independent and impartial judiciary is matched by its equally important interest in preserving public confidence in that independence and impartiality."). White I expressly acknowledged this point: "The Court of Appeals concluded that respondents had established *two interests as sufficiently compelling* to justify the announce clause: preserving the impartiality of the state

impartiality in some depth, given the interest has garnered far too little attention in White I and White II.

_____

judiciary *and preserving the appearance of the impartiality* of the state judiciary." 536 U.S. at 775 (emphasis added). From there, White I proceeded to analyze the vague concept of "impartiality," which was a common term to both asserted interests. Id. at 775-78. In assessing the first meaning of the term, "the lack of bias for or against either *party* to the proceeding," the Court held "the announce clause is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense." Id. at 775-76. Importantly, the Court reached its conclusion under the narrow tailoring prong of the strict scrutiny analysis, instead of deciding the asserted interests were not compelling under the first prong. See White II, 416 F.3d at 754 ("In White [I], the Supreme Court found the announce clause failed the narrow tailoring aspect of the strict scrutiny test[.]"). This explains why we concluded in White II that the Supreme Court implied the first meaning of "impartiality" described a compelling interest—a conclusion with which Judge Beam apparently agrees with regard to actual bias. White II, 416 F.3d at 753.

Having agreed White I implied a compelling interest with respect to impartiality, Judge Beam fails to explain how White I simultaneously rejected any implication with regard to preserving the appearance of impartiality, particularly because the language quoted by Judge Beam supposedly in favor of his argument speaks of *both* interests. See White I, 536 U.S. at 776 ("[T]he announce clause is not narrowly tailored to serve impartiality (*or the appearance of impartiality*) in this sense.") (emphasis added). Nor does Judge Beam explain why this court in White II proceeded to analyze the tailoring of the partisan-activities clause with respect to preserving the appearance of impartiality if there was not "even a hint" the interest was compelling. See White II, 416 F.3d at 755 ("Through recusal, the same concerns of bias *or the appearance of bias* that Minnesota seeks to alleviate through the partisan-activities clause are thoroughly addressed without burning the house to roast the pig.") (internal quotation marks and citation omitted) (emphasis added). Finally, as a more fundamental matter, Judge Beam fails to illustrate how due process does not encompass concerns over the appearance of impartiality. See Seifert, 608 F.3d at 985 ("Due process requires both fairness and the appearance of fairness in the tribunal.").

-18-

Similar to the definition of impartiality provided in <u>White I</u> as "the lack of bias for or against either *party* to the proceeding," 536 U.S. at 775, the appearance of impartiality may be defined as the perception the public maintains regarding the judiciary's lack of bias for or against either party to a proceeding. See <u>Caperton</u>, 129 S.Ct. at 2266 ("The ABA Model Code's test for appearance of impropriety is 'whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.'") (quoting ABA Annotated Model Code of Judicial Conduct, Canon 2A, Commentary).[7]  As this definition suggests, there is a significant relation between actual and perceived impartiality, although the two concepts are unique.  For instance, a judge who harbors a bias against a particular group, but shows no outward manifestations of the bias lacks impartiality, even though there is no appearance of bias.  At the same time, a judge who uses disrespectful language to one party may be perceived as lacking impartiality, even if that judge in fact harbors no actual bias against the party.

These examples highlight some important differences between the two concepts.  First, actual impartiality concerns the mental state of a particular judge, whereas the appearance of impartiality arises from the public's perception of that judge.  Second, the appearance of impartiality often stems from the collective awareness of the public, and thus Minnesota's interest in maintaining the appearance of impartiality is in this sense broader and qualitatively different than its interest in fostering actual impartiality. See <u>Buckley v. Valeo</u>, 424 U.S. 1, 27 (1976) (discussing

---

[7]While our case law speaks of an affirmative interest in preserving the "appearance of impartiality," we note it may be more correct to phrase the interest in the negative as "avoiding the appearance of impropriety," similar to the ABA Model Code's language.  Under the latter phrasing, we assume actual impartiality exists, and the state has an additional interest in avoiding a negative appearance in the public's eye.  Regardless of this technical distinction, we use the phrases "appearance of impartiality" and "avoiding the appearance of impropriety" interchangeably herein.

the appearance of corruption, which "stem[s] from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions."). Instead of aiming to protect the due process rights of actual parties to a case, maintaining the appearance of impartiality is systemic in nature, as it is essential to protect the judiciary's reputation for fairness in the eyes of all citizens. This reputational interest is not a fanciful one; rather, public confidence in the judiciary is integral to preserving our justice system. See Mistretta v. United States, 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."); In re Murchison, 349 U.S. 133, 136 (1955) ("[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.'") (quoting Offutt v. United States, 348 U.S. 11, 14 (1954)); Bauer v. Shepard, 620 F.3d 704, 712 (7th Cir. 2010) ("The judicial system depends on its reputation for impartiality; it is public acceptance, rather than the sword or the purse, that leads decisions to be obeyed and averts vigilantism and civil strife.").[8] As

_____

[8]Contrary to Judge Beam's suggestion, a focus on *public* perception is not antithetical to our analysis of whether the interest is compelling. Post at 59-62. Tellingly, Judge Beam cites no authority in support of the additional limitations he seeks to engraft onto the compelling interest inquiry. See generally White II, 416 F.3d at 749-50 (discussing the compelling interest determination). As set forth above, it should be of little dispute that having public confidence in the judiciary is an interest of the highest order. See Caperton, 129 S.Ct. at 2266 ("[The Codes of Judicial Conduct] are the principal safeguard against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation's elected judges. This is a vital state interest.") (internal quotation marks and citation omitted); see also Cox v. Louisiana, 379 U.S. 559, 565 (1965) ("A State may also properly protect the judicial process from being misjudged in the minds of the public."). Even Wersal conceded Minnesota has a separate interest in maintaining the appearance of impartiality at oral argument before the panel in this matter.

Ultimately, the concern of the dissenting and concurring judges that maintaining the appearance of impartiality is a broadly defined state interest likely to infringe on candidates' speech rights is misguided. One need look no further than

Justice Kennedy stated in <u>White I</u>:

> Here, Minnesota has sought to justify its speech restriction as one necessary to maintain the integrity of its judiciary. Nothing in the Court's opinion should be read to cast doubt on the vital importance of this state interest. Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order.

536 U.S. at 793; <u>see also</u> Jed Handelsman Shugerman, <u>In Defense of Appearances: What Caperton v. Massey Should Have Said</u>, 59 DePaul L. Rev. 529, 541 (2010) ("As Balzac once wrote, 'To distrust the judiciary marks the beginning of the end of society.'") (citation omitted).

Lest there be any doubt about Minnesota's conviction in the importance of preserving the appearance of impartiality, the Minnesota Supreme Court fortified these principles directly into the Code:

> An independent, fair, and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary,

---

<u>White I</u> to demonstrate this point. Once again, <u>White I</u> *struck down* the announce clause due to the lack of narrow tailoring, *while implying the state had an interest in preserving the appearance of impartiality*. 536 U.S. at 776. As we discuss below, the present clauses are narrowly tailored, and thus this case is distinguishable. Therefore, our recognition of the state's interest in preserving the appearance of impartiality does not in any way foreclose future challenges to clauses that "unnecessarily circumscribe protected expression." <u>Id.</u> at 775 (internal quotation marks and citation omitted).

composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, the judiciary plays a central role in preserving the principles of justice and the rule of law. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.

52 Minn. Stat. Ann., Code of Judicial Conduct, Preamble. The Code proceeds to guide judges to "maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives," as well as to "aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence." Id.; see also Caperton, 129 S.Ct. at 2266 ("Almost every State . . . has adopted the American Bar Association's objective standard: 'A judge shall avoid impropriety and the appearance of impropriety.'") (quoting ABA Annotated Model Code of Judicial Conduct, Canon 2 (2004)).

In light of the foregoing, we easily conclude Minnesota's interest in preserving the appearance of impartiality is compelling, particularly when cast against other interests courts have recognized as compelling. See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L.Rev. 917, 935 n. 85 (1988) (collecting cases recognizing various compelling interests). In sum, we conclude Minnesota has met its burden of demonstrating a compelling state interest in (1) maintaining judicial impartiality and (2) maintaining the appearance of judicial impartiality.[9] See Siefert, 608 F.3d at 985 ("Due process requires both fairness and the appearance of fairness in the tribunal.").

---

[9]Because we ultimately conclude the challenged provisions are narrowly tailored to these compelling interests, we need not decide whether Minnesota's remaining asserted interests are compelling.

## 2. Narrowly Tailored

Having concluded Minnesota has established the above compelling interests, we proceed to consider whether the challenged provisions of the Code are narrowly tailored to serve those interests. In doing so, we must examine the relatedness between the regulation and the asserted interests:

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

White II, 416 F.3d at 751.

### a. Endorsement Clause

We first address the endorsement clause, which states a judge or a judicial candidate shall not "publicly endorse or, except for the judge or candidate's opponent, publicly oppose another candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(3). Wersal contends this prohibition does not serve to limit actual bias regarding parties, because while there is a slight risk a judge will become biased in the event he or she receives an endorsement, the same is not true when the judge or candidate makes an endorsement. Moreover, Wersal argues even if the judge or candidate is biased in favor of the candidate he or she endorses, the endorsement is not the cause of the bias, but mere evidence of its previous existence. Thus, Wersal asserts the justification for the endorsement clause must turn on the appearance of bias created by the endorsement, but he claims such concerns are best dealt with via recusal.

For support, Wersal relies on our decision in White II, where we stated, "[i]n one sense, the underlying rationale for the partisan-activities clause—that associating with a particular group will destroy a judge's impartiality—differs only in form from that which purportedly supports the announce clause—that expressing one's self on particular issues will destroy a judge's impartiality." 416 F.3d at 754 (emphasis omitted). Recognizing the protection afforded to the right of association, we concluded the partisan-activities clause was "barely tailored" to any interest in impartiality toward parties to the extent it sought "to keep judges from aligning with particular views on issues by keeping them from aligning with a particular political party." Id. According to Wersal, this reasoning may be extended to the endorsement clause, because a candidate's association with another candidate by way of an endorsement is no more a threat to impartiality than a candidate associating with a political party or political interest group. Similarly, in this sense, Wersal contends the endorsement clause is overbroad because Minnesota has no interest in preventing judges or candidates from associating themselves with like-minded individuals and groups.

Like the district court, we conclude the endorsement clause serves the compelling interests of preserving impartiality and avoiding the appearance of impropriety. At the outset, we must refuse Wersal's attempt to liken the endorsement clause to the partisan-activities clause in White II. In White I, the Supreme Court concluded the announce clause was "barely tailored" because "it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*." 536 U.S. at 776 (emphasis in original). While White II concluded the partisan-activities clause was, in one sense, merely an extension of the announce clause in White I, see White II, 416 F.3d at 754-55, the same is not true here because the endorsement clause is plainly a restriction of speech for or against particular parties, rather than for or against particular issues. See Yost v. Stout, No. 06-4122-JAR, slip op. at 12 (D. Kan. Nov. 16, 2008) (upholding a clause "restrict[ing] a judge or judicial candidate from publicly endorsing other candidates

-24-

for public office [because] it does not restrict speech concerning disputed political issues."). When a judge or judicial candidate endorses another candidate, it creates a risk of partiality toward the endorsed party and his or her supporters, as well as a risk of partiality against other candidates opposing the endorsed party. The endorsement clause is directly aimed at this speech about parties, as it prevents potential litigants in a case from the risk of having an unfair trial. At the very least, the clause serves the State's interest in avoiding the appearance of impropriety. Namely, even if a particular endorsement does not serve to create an actual bias toward or against a particular party, the act of endorsement itself undermines the judiciary's appearance of impartiality because the public may perceive the judge to be beholden to political interests.

Our conclusion is bolstered by the Seventh Circuit's recent decision in Siefert, where the court rejected a judge's attempt to analogize an endorsement clause with a partisan-activities clause:

> While an interest in the impartiality and perceived impartiality of the judiciary does not justify forbidding judges from identifying as members of political parties, a public endorsement is not the same type of campaign speech targeted by the impermissible rule against party affiliation in this case or the impermissible rule against talking about legal issues the Supreme Court struck down in White I. As Judge Siefert notes, "endorsements primarily benefit the endorsee, not the endorser" and endorsements may be exchanged between political actors on a quid pro quo basis. This amounts to a concession that offering an endorsement is less a judge's communication about his qualifications and beliefs than an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker.
> . . . .
> When judges are speaking as judges, and trading on the prestige of their office to advance other political ends, a state has an obligation to regulate their behavior. We thus see a dividing line between the party affiliation rule, which impermissibly bars protected speech about the

judge's own campaign, and the public endorsement rule, which addresses a judge's entry into the political arena on behalf of his partisan comrades.

608 F.3d at 984 (citation omitted). Although the court expressed these concerns en route to applying a balancing approach, instead of strict scrutiny, we find them equally valid under the strict scrutiny approach. Under either framework, a judge "who tips the outcome of a close election in a politician's favor would necessarily be a powerful political actor, and thus call into question the impartiality of the court." Id. at 986.

Of course, unlike Siefert, which did not apply strict scrutiny, "[t]he question under our strict scrutiny test . . . is not whether the [endorsement] clause serves this interest *at all*, but whether it is *narrowly tailored* to serve this interest." White I, 536 U.S. at 777 n.7 (emphasis in original). With this in mind, we must address whether the endorsement clause is overinclusive, underinclusive, or whether there is a less restrictive means of accomplishing the State's interests.

We first conclude the endorsement clause is not overinclusive because it does not sweep too broadly. As noted above, unlike the announce clause struck down in White I, the endorsement clause restricts speech for or against particular parties. Although there is some merit in Wersal's argument that an endorsement would serve as a proxy for other underlying ideas, taken to its logical conclusion, such an approach would eviscerate the entire party-issue dichotomy set forth in White I. Under this reasoning, even direct statements of bias toward or against a party could be said to serve as a proxy for underlying issues, even though such statements would undeniably violate a party's due process guarantees. See id. at 775-76 (discussing the traditional meaning of impartiality).

-26-

Instead, we abide by White I's directive to analyze whether the clause "restrict[s] speech for or against particular *parties*, . . . [or] for or against particular *issues*." Id. at 776 (emphasis in original). This approach accords with the Supreme Court's jurisprudence, which analyzes content-based restrictions under strict scrutiny by reference to the content itself. See, e.g., Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 121-23 (1991) (discussing the overinclusiveness of a law preventing criminals from profiting by selling books describing their crimes). Here, the endorsement clause does not regulate speech with regard to any underlying issues, and thus the candidates are free to state their positions on these issues, in line with White I.[10] Moreover, candidates are not prevented from conveying necessary information concerning their qualifications to the electorate. See Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989) ("We have recognized repeatedly that debate on the qualifications of candidates is integral to the operation of the system of government established by our Constitution.") (internal quotations and citation omitted). Instead, the clause only prohibits the act of endorsement itself, which, as noted above, is a direct expression of bias in favor of or against potential parties to a case, or at the very least, damages the appearance of impartiality. Therefore, the clause targets precisely that speech which most likely implicates Minnesota's compelling interests.

We also conclude the endorsement clause is not underinclusive, despite the fact it only applies to endorsements for other "candidate[s] for public office." In response to the charge that a judicial candidate may endorse another public official so long as

---

[10]Judge Beam incorrectly suggests the endorsement clause is underinclusive because it fails to regulate a candidate's speech on a host of communications, including another candidate's campaign platform and point of view on an issue. Post at 63. Such restrictions would plainly be unconstitutional, however, pursuant to White I and White II. Thus, we are unpersuaded that the endorsement clause is unconstitutional because it fails to regulate other speech it could not constitutionally regulate.

-27-

the official has not yet filed for office, we find instructive another provision of the Code providing, "a judge or judicial candidate shall not . . . make any statement that would reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court . . . ." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(10). Reading the endorsement clause in conjunction with Rule 4.1(A)(10), a judicial candidate would patently be prevented from making biased statements for or against a party or an impending party, regardless of whether the public official had officially become a "candidate" at the time of the statement.

Nor is this a situation like the Seventh Circuit confronted in Siefert, where an endorsement clause only applied to endorsements in partisan elections. 608 F.3d at 987. Siefert recognized "this underinclusiveness could be fatal to the rule's constitutionality" under strict scrutiny. Id. By contrast, Minnesota's endorsement clause pertains to endorsements of any candidate for public office, regardless of whether the elections are partisan or nonpartisan, and thus the concerns articulated in Siefert do not bear fruit here.

Finally, we must address whether recusal would pose a less restrictive alternative to address Minnesota's compelling interests. In White II, we discussed recusal in the context of the partisan-activities clause, including the specific situation of "political cases where a judge is more personally involved," such as redistricting cases where a judge's district is at issue. 416 F.3d at 755. In these situations, we concluded "recusal is the least restrictive means of accomplishing the state's interest in impartiality articulated as a lack of bias for or against parties to the case." Id.

The present case presents a far different set of circumstances than those we contemplated in White II. To begin, our redistricting hypothetical in White II originated with our recognition that:

> [I]n a case where a political party comes before a judge who has substantially associated himself or herself with that same party, a question could conceivably arise about the potential for bias in favor of that litigant. Yet even then, any credible claim of bias would have to flow from something more than the bare fact that the judge had associated with that political party. That is because the associational activities restricted by Canon 5 are, as we have pointed out, part-and-parcel of a candidate's speech for or against particular *issues* embraced by the political party. And such restrictions, we have also said, do not serve the due process rights of *parties*.

Id. (emphasis in original). Here, as discussed in depth above, an endorsement itself *would* be enough to create bias or the appearance of bias, because it is speech directly in favor of or against *parties*, rather than speech regarding particular *issues*.

Second, our hypothetical in White II envisioned cases where recusals would be infrequent and relatively unburdensome, such that a blanket ban on the judge's conduct would be akin to "'burning the house to roast the pig.'" Id. (quoting Butler v. Michigan, 352 U.S. 380, 383 (1957)). Under Wersal's sought-after system of open endorsements, however, recusal would be an unworkable remedy because candidates and judges would be free to endorse individuals who would become frequent litigants in future cases, such as county sheriffs and prosecutors. See Siefert, 608 F.3d at 987 (discussing the difficulty of recusal "where a judge endorses a prosecutor or sheriff who frequently appears in front of the court"). Or, in the case of one of Wersal's proposed endorsements, the individual could become a district court judge subject to appellate review by the endorsing Supreme Court judge. Under either circumstance, this has the potential to create "an insurmountable burden for the court system." Wersal, 607 F. Supp. 2d at 1023; see also Br. of Former Governor & Chief Justices as *Amici Curiae* 4 ("Recusal is a blunt instrument, wielded differently by individual judges and in particular circumstances; and recusal motions are not infrequently only gamesmanship seeking delay.").

Moreover, even if the judiciary would not be plagued by these conflicts and inefficiencies, as Wersal suggests, we find little comfort in recusal as a less restrictive means of addressing Minnesota's separate interest in avoiding the appearance of impropriety. See Caperton, 129 S.Ct. at 2266 (recognizing the impact recusals have on the public's impression of the judiciary); Mistretta, 488 U.S. at 407 ("While the problem of individual bias is usually cured through recusal, no such mechanism can overcome the appearance of institutional partiality that may arise from judiciary involvement in the making of policy.").

In sum, we conclude Minnesota's endorsement clause is narrowly tailored to serve its compelling interests of preserving impartiality and preserving the appearance of impartiality. See In re Matter of William A. Vincent, 172 P.3d 605, 606, 609 (N.M. 2007) (concluding a clause prohibiting candidates or judges from "publicly endors[ing] or publicly oppos[ing] a candidate for public office through the news media or in campaign literature" was "narrowly tailored to serve the State's compelling interest in a judiciary that is both impartial in fact and in appearance") (internal quotation marks and citation omitted); In re Matter of Ira J. Raab, 793 N.E.2d 1287, 1292 (N.Y. 2003).

b. Solicitation Clause

We next address the solicitation clause, which bars judges and candidates from "personally solicit[ing] or accept[ing] campaign contributions other than as authorized by Rules 4.2 and 4.4." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(6). As noted above, Rules 4.2 and 4.4 allow candidates to solicit funds through a campaign committee, although the committee is not to disclose the identity of contributors to the candidate. Id. at Canon 4.2(B)(1) & 4.4(B)(3). Moreover, Rule 4.2 permits a candidate to "make a general request for campaign contributions when speaking to an audience of 20 or more people," and to "personally solicit campaign contributions from members of the judge's family, from a person with whom the

judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority." Id. at Canon 4.2(B)(3)(a) & (B)(3)(c).

Wersal contends the solicitation clause is not narrowly tailored to further Minnesota's interests in impartiality because it is not the solicitation, but the receipt of contributions that poses a risk to impartiality. Because the clause is not concerned with contributions, but with solicitation, Wersal argues it is "barely tailored" to Minnesota's interests in impartiality. Moreover, Wersal asserts information about who contributed to a judge's campaign is readily available via the Internet, and thus a ban on personal solicitation fails to further Minnesota's interests. To the extent the clause serves an interest in avoiding the appearance of impropriety, Wersal argues recusal is once again a less restrictive alternative. Finally, Wersal challenges Minnesota's decision to permit solicitations to groups of 20 or more people, which he claims demonstrates either underinclusiveness or overinclusiveness.

In considering Minnesota's old solicitation clause in White II, we began our analysis by recognizing, "[k]eeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case." 416 F.3d at 765. However, we determined it was unlikely a judicial candidate would be biased in favor of or against a litigant based on a contribution to the candidate's campaign, because the Code provided such contributions would be made to the candidate's committee, and the committee was barred from disclosing those who did or did not contribute to the committee. Id. Accordingly, we concluded the contested portions of the solicitation clause—those dealing with a candidate's signature or solicitations to large groups—were "barely tailored" to Minnesota's interests in impartiality due to the candidate's inability to decipher the source of funds in response to a solicitation in either circumstance. Id. at 765-66.

As the district court correctly observed, our conclusion in White II was largely predicated on the distinction between the large group solicitation and signature bans challenged in White II, and personal solicitation, which is challenged in the present case.[11]  Namely, unlike the challenged portions in White II, direct personal solicitation creates a situation where potential contributors must choose to either contribute to the candidate, or decline to contribute, with a resulting risk of retribution.  See In re Dunleavy, 838 A.2d 338, 351 (Me. 2003) ("If a contribution is made, a judge might subsequently be accused of favoring the contributor in court.  If a contribution is declined, a judge might be accused of punishing a contributor in court.").  In either scenario, the candidate is more likely to decipher whether the potential donor chooses to make a contribution, which gives rise to a greater risk of a quid pro quo.  See Br. of Former Governor & Chief Justices as *Amici Curiae* 3 ("[T]here is no way to have meaningful campaign solicitations where a candidate can freely solicit contributions in one-on-one meetings with prospective donors without a substantial likelihood of learning, at least in many instances, the outcome of the 'ask.'").

In Siefert, the Seventh Circuit similarly recognized the cumulative effect of the scenario posed above:

> A contribution given directly to a judge, in response to a judge's personal solicitation of that contribution, carries with it both a greater potential for a quid pro quo and a greater appearance of a quid pro quo than a contribution given to the judge's campaign committee at the

---

[11]Minnesota's decision to permit solicitations to groups of 20 or more people, which Wersal also now challenges, was in response to our discussion in White II.  We find Wersal's arguments based on this decision unavailing, because, as the district court concluded, "[t]he setting of the group size at a minimum of twenty persons is not talismanic, but the inclusion of a number does not, by itself, establish an arbitrary political speech restriction."  Wersal, 607 F. Supp. 2d at 1026.

request of someone other than the judge, or in response to a mass mailing sent above the judge's signature.

608 F.3d at 989. Specifically, "[a] direct solicitation closely links the quid—avoiding the judge's future disfavor—to the quo—the contribution." Id.

We must emphasize once more Minnesota's separate interest in avoiding the appearance of impropriety. Regardless of whether a potential donor chooses to make a contribution—and whether a candidate ultimately learns of the donor's choice—the appearance of impartiality is attenuated. See id. at 989-90 ("We do not mean to suggest that judges who directly solicit contributions are necessarily behaving inappropriately, but the appearance of and potential for impropriety is significantly greater when judges directly solicit contributions than when they raise money by other means."). "Even if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary." White I, 536 U.S. at 790 (O'Connor, J., concurring). Therefore, "'[i]nsulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, preserves the judiciary's reputation for integrity.'" Stretton v. Disciplinary Bd. of Supreme Court of Penn., 944 F.2d 137, 145 (3d Cir. 1991) (quoting In re Fadeley, 802 P.2d 31, 40 (Or. 1990)).

Additionally, as we highlighted in White II, unlike the judicial codes in some states, Minnesota's Code "prevents a candidate from knowing the identity of contributors or even non-contributors[.]" 416 F.3d at 766. This feature serves to distinguish this case from others where the candidate was permitted to learn the identity of the contributors, and thus Wersal's argument finds little support by relying on these cases. See, e.g., Carey, 614 F.3d at 205 ("The clause . . . does not bar the candidate from learning how individuals responded to the committee's solicitations. That omission suggests that the only interest at play is the impolitic interpersonal

dynamics of a candidate's request for money, not the more corrosive reality of who gives and how much."); Weaver v. Bonner, 309 F.3d 1312, 1322-23 (11th Cir. 2002) ("Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of support.").[12] We find Wersal's counter-argument that candidates may learn the identity of donors through the Internet unavailing. As Minnesota points out, this is true regarding a number of provisions of the Code. For instance, a judge could independently investigate the facts of a case through the Internet, despite the Code's prohibition against this activity. See 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 2.9(C) ("A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed."). Simply because a judge or candidate may decide to violate the Code's proscriptions is not a testament to their unconstitutionality.

For the foregoing reasons, the "ask" is precisely the speech Minnesota must regulate to maintain its interest in impartiality and the appearance of impartiality. See Siefert, 608 F.3d at 990 ("[T]he personal solicitation itself presents the greatest

---

[12]The dissenting judges frame the provision preventing a candidate's knowledge of a contributor's identity as ineffective and underinclusive. Yet, the dissenting judges are largely silent regarding the import of White II to this case. Far from questioning the effectiveness of the knowledge provision, White II considered the provision to be the crux of its decision overturning the large group solicitation ban, because the candidate was unlikely to have any bias due to the fact the contributions were made to the candidate's committee and the committee was forbidden from disclosing the identity of contributors. 416 F.3d at 765. Likewise, the lack of a similar provision was central to the Sixth Circuit's decision in Carey, a case Judge Colloton relies heavily upon. See Carey, 614 F.3d at 205 ("If the purported risk addressed by the clause is that the judge or candidate will treat donors and non-donors differently, it is knowing who contributed and who balked that makes the difference[.]"). In fact, Carey expressly opined that a clause prohibiting in-person solicitations may be constitutional, as opposed to large group or mass-mailing solicitations. Id. at 206. The same can be inferred from White II.

-34-

danger to impartiality and its appearance."); see also Bauer, 620 F.3d at 710 (upholding the constitutionality of a personal solicitation clause due to the "potential for actual or perceived mutual back scratching").

We turn last to Wersal's renewed suggestion that recusal is a less restrictive means of preventing bias. Although we did not address recusal in White II in the context of solicitation, we are persuaded by the Seventh Circuit's analysis on the issue. In Siefert, the court concluded there was no less restrictive means available, because of the fact "that judicial campaigns are often largely funded by lawyers, many of whom will appear before the candidate who wins," and thus "[i]t would be unworkable for judges to recuse themselves in every case that involved a lawyer whom they had previously solicited for a contribution." 608 F.3d at 990.

We are also mindful of the recent Supreme Court decision in Caperton, where the Court held the Due Process Clause required a judge to recuse himself in an appeal involving a corporation whose chief executive officer spent over $2.5 million in support of the judge during his election, "whether or not actual bias exist[ed] or [could] be proved." 129 S.Ct. at 2257-58, 2265. Although the Court stressed the "extreme" nature of the facts leading to the recusal, we find Caperton illustrative of the unworkability of recusal in the present case. Namely, recusal serves as an after-the-fact remedy that is insufficient to cure the damage to the appearance of impartiality fashioned by personal solicitation, which is by and large complete at the time of the "ask." At the very least, by the time the Due Process Clause requires recusal of a judge, the appearance of impartiality has already been impaired.

In sum, we conclude recusal would not be a workable remedy to prevent bias or, in particular, the appearance of bias stemming from personal solicitations. We therefore hold the solicitation clause is narrowly tailored to serve Minnesota's interests in preserving impartiality and preserving the appearance of impartiality.

-35-

"As Justice O'Connor noted in her White concurrence, 'the very practice of electing judges undermines an interest' in an actual and perceived impartial judiciary." White II, 416 F.3d at 747 (quoting White I, 536 U.S. at 788 (O'Connor, J., concurring)). Nonetheless, in White II, we explicitly stated we did "not 'doom,' by setting the bar too high, all future attempts by Minnesota to adopt judicial election regulations that will pass strict scrutiny." Id. at 763 n.14. This case presents such constitutionally permissible regulations we opined of in White II. For the foregoing reasons, we affirm the district court's decision upholding the constitutionality of the challenged provisions.

LOKEN, Circuit Judge, with whom WOLLMAN, Circuit Judge, joins, concurring in the judgment.

In Republican Party of Minnesota v. White, the Supreme Court invalidated a provision of the Minnesota Code of Judicial Conduct prohibiting a candidate for judicial office from announcing his or her views on disputed legal or political issues because it "burden[ed] a category of speech that is 'at the core of our First Amendment freedoms' -- speech about the qualifications of candidates for public office." 536 U.S. 765, 774 (2002) ("White I"). The Court applied the strict scrutiny test because neither party urged that a different test be applied. Id. Justice Anthony Kennedy joined the opinion but also stated what I believe to be the operative principle that precludes censorship of "core" political speech in judicial elections:

> Minnesota may choose to have an elected judiciary. It may strive to define those characteristics that exemplify judicial excellence. It may enshrine its definitions in a code of judicial conduct. It may adopt recusal standards more rigorous than due process requires, and censure judges who violate these standards. What Minnesota may not do, however, is censor what the people hear as they undertake to decide for

themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State.

536 U.S. at 794 (Kennedy, J., concurring).[13] Thus, I agree with Judge Beam that the majority's reliance on a broadly defined state interest "in maintaining the appearance of impartiality," ante at 19, would likely result in upholding restrictions on candidates' core political speech that are prohibited by White I.

The restrictions at issue in this case, however, apply to campaign activities that implicate the First Amendment but do not directly burden speech by judicial candidates regarding their qualifications for office. In Republican Party of Minnesota v. White, 416 F.3d 738, 763-64 (8th Cir. 2005) (en banc) ("White II"), we held, citing cases that hardly demanded the conclusion, that rules restricting judicial candidates in soliciting campaign contributions are subject to strict scrutiny. There is now a conflict in the circuits on that issue. See Bauer v. Shepard, 620 F.3d 704, 710 (7th Cir. 2010), and cases cited. I favor stringent First Amendment scrutiny, so long as it accounts for genuine differences in the type of speech being restricted and in the interests underlying the restriction. Thus, I dissented from the striking down of a broader solicitation clause in White II, id. at 766, agreeing with Judge John R. Gibson that the majority's application of strict scrutiny illustrated the "futility of requiring unattainable precision." Id. at 785 (Gibson, J., dissenting). For that reason, plus the more limited restrictions here at issue, I cannot join Judge Beam's dissent in this case.

---

[13]Significantly, in my view, since White I, Justice Kennedy and the Court have twice upheld measures ensuring that elected state judges are independent and impartial that did *not* burden the core political speech of judicial candidates seeking to be elected. See Caperton v. A.T. Massey Coal Co., 129 S. Ct. 2252, 2266-67 (2009) (opinion of the Court), a recusal case, and N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 212 (2008) (Kennedy J., concurring), where the Court unanimously upheld New York's special structuring of its judicial election process.

1.  The personal solicitation clause is part of Minnesota's regulation of judicial campaign financing.  Campaign financing is heavily regulated at all levels of federal, state, and local government, albeit with substantial First Amendment oversight.  The majority effectively demonstrates why direct personal solicitations by judicial candidates creates a substantial risk of "quid pro quo" relationships that threaten the compelling state interest of judicial impartiality recognized in White I -- "the lack of bias for or against either *party* to the proceeding," 536 U.S. at 775.  One can legitimately question the effectiveness of this restriction by asking whether the "risk that judges will be tempted to rule a particular way because of contributions" is "significantly reduced by [only] allowing the candidate's agent to seek these contributions . . . on the candidate's behalf."  Weaver v. Bonner, 309 F.3d 1312, 1322-23 (11th Cir. 2002).  But the personal solicitation restriction is narrowly aimed at what appears to be the greatest threat to actual impartiality arising out of the essential need to fund judicial campaigns.  Because Rules 4.2 and 4.4 allow all judicial candidates adequate opportunity to fund their campaigns, I agree with the majority that the personal solicitation clause survives a proper level of strict scrutiny.

2.  The endorsement clause, too, warrants a different quantum of strict scrutiny because it "differentiates what judges can do in their own campaigns (the subject of *White I*) from how judges can participate in other persons' campaigns (the subject of *Letter Carriers*[14] and similar decisions)."  Bauer, 620 F.3d at 713.  The clause certainly triggers the First Amendment concern underlying the decision in White I.  As Judge Beam points out, "Endorsing a well-known candidate is often a highly effective and efficient means of expressing one's own views on issues."  Post at 70.  But the extent of the restriction on core political speech is *de minimis*.  Saying, "I endorse candidate Michele Bachmann," is barred, but saying, "I agree with candidate Michele Bachmann on every issue," is permitted.

---

[14]U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,413 U.S. 548 (1973).

My decision to uphold the endorsement clause is based on a different compelling state interest than the impartiality interest(s) on which the majority relies, namely, Minnesota's asserted interest in protecting the political independence of its judiciary. See In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4 (Minn. Sept. 14, 2004), quoted in White II, 416 F.3d at 752 n.7.[15] Although judicial independence if broadly defined can be viewed as interchangeable with the interest in judicial impartiality, the narrow interest in judicial independence I will address is distinct from the impartiality interests asserted in White I -- avoiding bias for or against parties in particular judicial proceedings -- and therefore was not considered by the Supreme Court in deciding that case, see 536 U.S. at 775 n.6.

In an oft-quoted passage, Alexander Hamilton summarized the importance of judicial independence: "The independence of the judges, once destroyed, the constitution is gone; it is a dead letter, it is a vapor which the breath of faction in a moment may dissipate."[16] More recently, columnist George Will concisely declared, "What primarily stands between us and misrule . . . is the Constitution, buttressed by an independent judiciary." Op-Ed., Wash. Post, Dec. 22, 2011, at A19. "Those who wrote our constitutions knew from history and experience that it was necessary to protect . . . against judges too responsive to the voice of higher authority." Duncan v. Louisiana, 391 U.S. 145, 156 (1968).

---

[15]See also Peterson v. Stafford, 490 N.W.2d 418, 420 (Minn. 1992); In re Lord, 97 N.W.2d 287, 289 (Minn. 1959).

[16]Alexander Hamilton, The Examination, Com. Advertiser (New York), Feb. 26, 1802, as reprinted in XXV The Papers of Alexander Hamilton 525 (Harold C. Syrett ed., 1977), quoted by Chief Justice John G. Roberts, Jr., in his 2006 Year-End Report on the Federal Judiciary, Third Branch (Admin. Office of the U.S. Courts, Wash. D.C.), Jan. 2007, at 6-7, available at http://www.supremecourt.gov/publicinfo/year-end/2006year-endreport.pdf, and by Justice Stephen Breyer in Judicial Independence: Remarks by Justice Breyer, 95 Geo. L.J. 903, 905 (2007).

A judicial candidate's endorsement of a candidate for executive or legislative office does more than indirectly announce the judicial candidate's views on particular issues. See Siefert v. Alexander, 608 F.3d 974, 983 (7th Cir. 2010). An endorsement links the judicial candidate's political fortunes to a particular person, who may then come to hold office in a coordinate branch of government. This is antithetical to any well-considered notion of judicial independence -- that we are a "government of laws, not of men." This kind of *personal* affiliation between a member of the judiciary and a member of the political branches raises the specter -- readily perceived by the general public -- that the judge's future rulings will be influenced by this political dependency. And the perception of bias is not limited to cases in which the endorsed politician is a party; it extends to any case of sufficient significance to the endorsee that he or she may privately signal the politically-desired result to the devoted judge. Can anyone doubt this is a compelling state interest? No less a statesman than Chief Justice John Marshall declared that the "greatest scourge . . . ever inflicted was an ignorant, a corrupt, or a dependent Judiciary." Proceedings and Debates of the Virginia State Convention of 1829-30, p. 619 (1830), quoted in United States v. Hatter, 532 U.S. 557, 569 (2001).

The Declaration of Independence identified as one of the "Injuries and Usurpations" King George inflicted on the States, "He has made judges dependent on his Will alone . . . ." ¶ 11. Modern history demonstrates that this threat to freedom persists. Litigants in the former Soviet Union routinely confronted "telephone justice," in which Communist Party leaders would call judges and instruct them how to rule in key cases. Alexander Solzhenitsyn vividly described this kind of dependent judiciary: "In his mind's eye the judge can always see the shiny black visage of truth -- the telephone in his chambers. This oracle will never fail you, as long as you do what it says." The Gulag Archipelago, vol. III 521 (1974), quoted in Jeffrey Kahn, The Search for the Rule of Law in Russia, 37 Geo. J. Int'l L. 353, 385 (2006). Predictably, decades of telephone justice came to permeate judicial attitudes and surely corroded public confidence in the Russian judiciary. The lingering adverse

effects were apparent to Justice Breyer when he visited a convention of Russian judges in 1993, after Boris Yeltsin's election:

> Telephone justice . . . occurred when the party boss called judges and told them how to decide the outcome of a particular case. And the assembled judges spoke about the practice very frankly. . . . The Russian judges, in turn, asked me whether telephone justice exists in the United States. When I told them that we do not have such a practice, the Russian judges looked at me incredulously. What happens, the judges asked, when the politicians who helped you obtain your judgeship call in a favor regarding a pending case? Again, I told them that no such call would be placed. . . . [T]hey thought that I was merely being discreet in an effort to protect my supporters.

Judicial Independence, 95 Geo. L.J. at 904-05. When pervasive, this perception corrodes public trust in the courts. Public opinion that judges decide cases based upon their personal political views is unhealthy. But public opinion that judges decide cases based upon the wishes of their political cronies would be far worse. "The rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges." Lopez Torres, 552 U.S. at 212 (Kennedy J., concurring).

Minnesota's Code of Judicial Conduct protects the State's interest in the appearance as well as the reality of a politically independent judiciary. See Rule 1.2 (judges shall act "at all times in a manner that promotes public confidence in the independence . . . of the judiciary."); Rule 2.4(B) ("A judge shall not permit . . . political . . . interests or relationships to influence the judge's judicial conduct or judgment."); Rule 2.4(C) ("A judge shall not convey . . . the impression that any person or organization is in a position to influence the judge."). I conclude that the endorsement clause narrowly addresses the compelling state interest in preventing judicial dependency, while leaving judicial candidates ample freedom to announce their views on issues that may affect their qualifications for judicial office. For these

reasons, while one may legitimately debate *the extent to which* the endorsement prohibition will accomplish this intended purpose, in my view it is narrowly-tailored and therefore survives an appropriate level of strict constitutional scrutiny.

BEAM, Circuit Judge, with whom RILEY, Chief Judge, joins, dissenting.

Minnesota elects its judges. Minn. Const. art. 6, § 7. Since judicial elections are subject to the full panoply of rights protected by the First Amendment, Republican Party of Minnesota v. White, 536 U.S. 765 (2002) (White I), I confess to "some bias in favor of a system for the appointment of judges," Republican Party of Minnesota v. White, 416 F.3d 738, 746 (8th Cir. 2005) (en banc) (White II). But, the people of Minnesota have four times rejected the so-called Missouri Plan under which the governor fills vacancies on the courts by non-partisan appointment, subject only to a retention vote. Maynard E. Pirsig, The Proposed Amendment of the Judiciary Article of the Minn. Constitution, 40 Minn. L. Rev. 815, 815-19 (1955-56); Peterson v. Stafford, 490 N.W.2d 418, 421-22 (Minn. 1992).

Attempting to ameliorate partisan political influence in these contests, the Minnesota legislature made judicial election ballots non-partisan affairs. Peterson, 490 N.W.2d at 422; Minn. Stat. Ann. § 204B.06(6). In addition, incumbent members of the Minnesota Supreme Court (sometimes Minnesota), through various subalterns named in this litigation (collectively the Appellees), often in the name of judicial "independence," "impartiality," and "integrity," long ago began to enact rules and regulations of judicial behavior, including conduct during judicial elections. See generally 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.

These election-conduct rules, several of which have now been deemed unconstitutional, see White I and White II, have created headwinds for non-incumbent aspirants for judicial office in the state. A non-incumbent candidate has been elected to the Minnesota Supreme Court only twice since 1947. Justice Peterson

was elected to an "open seat" on the court in 1966. And, Justice Alan C. Page was elected in another "open seat" election in 1992. According to press accounts, "Page [a pro-football icon and Hall of Fame member of the Minnesota Vikings] forced the open seat on the court by suing after Gov. Arne Carlson extended Associate Justice Lawrence Yetka's term for 22 months. A panel of judges ruled the governor's term extension authority did not apply in Yetka's case." Pam Schmid, Alan Page: A Seat on Bench But This Time It's an Honor, Seattle Post-Intelligencer, Nov. 5, 1992, at D11. Otherwise, only incumbents have prevailed. This incumbency success rate is partly driven by a state constitutional provision, Minnesota Constitution article 6, section 8, that allows a governor to appoint a judge when a vacancy arises and provides that the replacement shall serve at least one year. Taking advantage of this provision, currently sitting Minnesota judges have routinely tended to retire shortly before the end of their last term, allowing the appointed replacement to garner the benefits of incumbency before having to face an election. One of these benefits occurs because in 1949, the Minnesota legislature changed the form of ballot used in judicial elections by placing the word "incumbent" by the names of judges running for re-election, including those recently appointed by the governor. This practice remains in place today. George W. Soule, The Threats of Partisanship to Minnesota's Judicial Elections, 34 Wm. Mitchell L. Rev. 701, 704 (2008).[17]

---

[17]Among its several contentions in support of its various rules and regulations, Appellees assert a "separation of powers" claim based upon Article III, section 1 of the Minnesota Constitution. Appellees' expositions in this regard are designed to advance a compelling state interest in judicial independence. The citizens of Minnesota have actually provided scant constitutional and statutory support for such an argument.

Article III, section 1 states:

The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any

of the powers properly belonging to either of the others *except in the instances expressly provided in this constitution.*

Minn. Const. art 3, § 1 (emphasis added).

While the Article mentions a distinct "judicial" department with "powers properly belonging" to it, the final clause of the Article limits judicial powers as "expressly provided in [its] constitution." And, for the Minnesota judicial branch, the limitations are numerous. As the saying goes, for the Appellees "the devil is in the details." In addition to the legislature's involvement with and control of the form of the judicial ballot, there are a plethora of other direct and indirect controls over the on-going operations of the Minnesota judicial system. The partisanly elected chief executive of state government has, since at least 1972, intimately involved himself in judicial selection and retention. The governor appoints a lawyer to fill a judicial vacancy and the appointee stands for election "at the next general election occurring more than one year after the appointment." Peterson, 490 N.W.2d at 423 (quotation omitted). As also noted, it has been standard practice for incumbent judges to vacate a judicial office shortly before the end of a term, allowing the executive-friendly appointee (more often than not a member of the governor's political party) to run as the "incumbent" at the next general election. This practice has resulted in the election of only one non-gubernatorial appointee to judicial office on the Minnesota Supreme Court in at least the last thirty years.

Likewise, the Minnesota Supreme Court promulgates the canons of judicial conduct at issue in this litigation at the direction of the Minnesota legislature who, in turn, may alter the ultimate work product produced. Minn. Stat. Ann. §§ 480.05, 480.058. The legislature also determines, with minor exceptions, the boundaries of many judicial districts. Id. § 2.722. The legislature establishes the schedule of fees and costs chargeable by Minnesota courts and dictates that such fees be placed in the general fund for the legislature's ultimate appropriation. Id. §§ 357.021, 357.08. The legislature validates rules of procedure and rules of evidence to be used in the Minnesota courts, id. §§ 480.058, 480.0591(6); sets judicial pay for judges, Minn. Const. art. 6, § 5; appropriates the operational budgets of the courts and controls the financing and building of court facilities, Minn. Stat. Ann. § 10.44.

Also, certain regulations have apparently created circumstances leading to a mismatch in the ability of incumbents and non-incumbents to raise campaign funds, the "mother's milk" of electoral success. McConnell v. FEC, 251 F. Supp. 2d 176, 481 (D. D.C. 2003) (quotation omitted). State campaign finance records indicate that in 2008 and 2010, incumbent candidates for contested elections for the Minnesota Supreme Court raised $207,369.62 in campaign funds as compared with $109,114.24 for non-incumbent opponents. One incumbent ran unopposed and raised $5,865.46. And, if press accounts and financial disclosure records are to be believed, some portion of this mismatch arises from Minnesota-based law firms that reportedly have organized an "incumbent's re-election fund," perhaps recognizing from earlier election results that there is greater certainty in picking the winner when supporting an incumbent. Nick Coleman, Judges Shouldn't Be Courting Votes, St. Paul Pioneer Press, Nov. 12, 1992, at 1B (hereinafter "Coleman"); Associated Press, Legal Experts Troubled by Gifts from Lawyers to Judges' Campaigns, St. Paul Pioneer Press, Oct. 25, 1992, at 3B (hereinafter "Associated Press") ("Minnesota has had a longstanding tradition of a separate group such as the Minnesota Justices Committee raising campaign money for incumbent judges.").[18]

In an admitted attempt to abate these headwinds and to somewhat level the playing field, Appellant Wersal has successfully instituted litigation to help remedy some of his non-incumbency problems. See White I and White II. Seeking further relief, he now challenges the constitutionality of additional rules, at least one of which was recently amended and newly imposed by the Appellees as a result of White II.

---

[18]As I noted in my dissent in Republican Party of Minnesota v. Kelly, 247 F.3d 854, 896 (8th Cir. 2001), in the 2000 judicial elections, the four supreme court justices seeking re-election raised a combined $505,070.63. Of their opponents, only two raised sufficient funds to even warrant disclosure under the legislature's reporting rules. The two together, however, raised only $23,582.67.

As I explain below, Wersal's new challenges are meritorious. Accordingly, I dissent from the conclusions of Judge Bye's opinion and some portions of Judge Loken's opinion.[19]

## I.    INTRODUCTION

Wersal has asserted and continues to assert that he wishes to conduct a range of election activities that he believes will tend to better his name recognition, campaign treasury and associational and communicational needs. To do so, he specifically challenges three regulations: the endorsement clause–Rule 4.1(A)(3)–and

---

[19]As I understand the posture of this case after examining the salmagundi of court opinions, there is a majority of judges of the en banc court who agree with two concepts: that the Rule 4.1(A)(4) (soliciting funds for a political organization) issue is not ripe for review, and that the personal solicitation clause in Rule 4.1(A)(6) is constitutional on the grounds that it is narrowly tailored to serve the compelling state interest of "actual impartiality." Four members of the en banc court agree with Judge Bye's opinion that the "appearance of impartiality" is also a compelling state interest, and that Rule 4.1(A)(3)'s endorsement clause is constitutional because it is narrowly tailored to serve both impartiality interests. Two members of the court, as stated in Judge Loken's opinion concurring in the judgment, believe the endorsement clause is constitutional only on the basis of the Appellees' asserted compelling interest in the political independence of its judiciary. Accordingly, for ease of reference only, I will refer to the opinion authored by Judge Bye as the "plurality," and the opinion authored by Judge Loken as the "concurrence." Where necessary, I refer to Judge Colloton's separate dissent as the "Judge Colloton opinion."

-46-

the two solicitation clauses–Rule 4.1(A)(4) and (6)–each of which rein in a judicial candidate's[20] speech.[21]

The endorsement clause prevents a judicial candidate from "publicly endors[ing] or, except for the judge or candidate's opponent, publicly oppos[ing] another candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(3). The personal solicitation clause prohibits a judicial candidate from "personally solicit[ing] or accept[ing] campaign contributions," id. Rule 4.1(A)(6), and the solicitation for a political organization or candidate clause provides that a judicial candidate shall not "solicit funds for a political organization or a candidate for public office," id. Rule 4.1(A)(4)(a).[22]

The facts of this case indicate the degree to which the provisions of Canon 4, past and present, have chilled Wersal's First Amendment speech and association rights. In early 2007, Wersal announced his intention to run for the office of Chief Justice of the Minnesota Supreme Court. As part of his campaign, Wersal wanted to publicly endorse certain other candidates for public office. Specifically, he desired to support Tim Tinglested, candidate for Associate Justice of the Minnesota Supreme Court, Glen Jacobsen, candidate for Minnesota District Court Judge, and Michele Bachmann, candidate for United States Congress in an obvious attempt to become

---

[20]The Code defines "judicial candidate" as "any person, including a sitting judge, who is seeking selection for judicial office by election or appointment." 52 Minn. Stat. Ann., Code of Judicial Conduct, Terminology.

[21]Notably, Canon 4 applies to both judicial candidates and to non-candidate judges. See 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1. I review the constitutionality of these clauses only as they apply to judicial candidates.

[22]These clauses are subject to certain other requirements and exceptions listed in Rules 4.2 and 4.4 of the Code. 52 Minn. Stat. Ann., Code of Judicial Conduct, Rules 4.2(A)(5), B(3) & 4.4(B)(1).

attractive to, and raise campaign money from, their supporters; to receive endorsements and helpful communications from the endorsed candidates and those backing them; and, by association, to announce as his own at least some of the governance ideas and principles advanced by the endorsed candidates. The endorsement clause prevented Wersal from engaging in any such electioneering activity.

Moreover, Wersal wanted to personally solicit funds for his 2008 campaign from "non-attorneys" by going door-to-door and by making personal phone calls asking for financial support. Wersal has pledged (and continues to pledge) to recuse himself from any case in which a known contributor is or becomes a party. However, the personal solicitation clause specifically barred him and continues to bar him from engaging in such activity.[23] Wersal also felt that the restraint upon solicitation of funds for a political organization or candidate clause further limited his efforts to seek campaign support and financial contributions for his own use from non-attorneys. Wersal's emphasis on soliciting from non-attorneys may have been an attempt to offset the well-documented practice of Minnesota law firms more generously

---

[23]Wersal's personal solicitation is, in and of itself, core political speech. White II, 416 F.3d at 764. "This is because the [restrictive solicitation] clause applies to requests for funds to be used in promoting a political message. . . . And promoting a political message requires the expenditure of funds." White II, 416 F.3d at 764.

> [V]irtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

Buckley v. Valeo, 424 U.S. 1, 19 (1976) (per curiam).

contributing to judicial incumbents than their non-incumbent challengers through their political funds and also through individual lawyers' contributions from within the firms. See Coleman.

Accordingly, Wersal believed that he could not wage an effective campaign as long as the endorsement and solicitation clauses remained in force. He, therefore, asked for injunctive and declaratory relief in the district court. After it became apparent that Wersal would not be able to get adequate relief prior to the 2008 campaign, he decided not to run for the Minnesota Supreme Court in that year, but to instead run for the Minnesota Supreme Court during the 2010 elections. In furtherance of his 2010 campaign, Wersal wished to engage in conduct parallel to that which he sought to engage in during the 2008 campaign. However, just as in 2008, Wersal continued to feel unconstitutionally limited by the contested clauses.

It is important to note that the perceived benefits arising from these campaign activities do not necessarily accrue only to Wersal's advantage. Minnesota voters are entitled to receive as much information about contesting candidates as possible, to the end that they are able to cast an informed ballot for the contender of their choice.[24]

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Inherent within this protection is the "corresponding right to associate with others in pursuit of a wide variety of political,

_____

[24]"Minnesota may choose to have an elected judiciary. It may strive to define those characteristics that exemplify judicial excellence. It may enshrine its definitions in a code of judicial conduct. It may adopt recusal standards more rigorous than due process requires, and censor *judges* who violate these standards. What Minnesota may not do, however, is censor what the people hear as they undertake to decide for themselves which *candidate* is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State." White I, 536 U.S. at 795 (Kennedy, J., concurring) (emphasis added).

social, economic, educational, religious, and cultural ends." <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 622 (1984); <u>see also</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 15 (1976) (per curiam) ("The First Amendment protects political association as well as political expression."). And, the First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 336 n.1 (1995).

The political speech burdened by the clauses at issue in this case "is the very stuff of the First Amendment." <u>White II</u>, 416 F.3d at 748. Indeed, "'the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" <u>Id.</u> (alteration in original) (quoting <u>Buckley</u>, 424 U.S. at 15). These rights and protections extend to campaigns for judicial office. <u>White I</u>, 536 U.S. at 774-88.[25] Our system of representative

---

[25]The concurrence agrees with the plurality's restriction of Wersal's core political speech through limitations placed upon his personal solicitation of funds to conduct an election campaign. Judge Loken, apparently discerning "a proper level of strict scrutiny," advances problematic and unsupportable theories. He states that the restriction passes strict scrutiny "[b]ecause Rules 4.2 and 4.4 [embracing Appellees' campaign committee fund-raising scheme] allow all judicial candidates *adequate opportunity* to fund their campaigns." <u>Ante</u> at 38 (emphasis added). This contention is squarely at odds with Supreme Court precedent.

> [T]he notion that the special context of electioneering justifies an *abridgment* of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. . . . It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign. We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.

<u>White I</u>, 536 U.S. at 781-82 (internal quotation and citation omitted).

Judge Loken's proposed substitution of Rules 4.2 and 4.4 for Wersal's acts of

democracy relies on such a protection of political speech, "for it is the means to hold officials accountable to the people." Citizens United v. FEC, 130 S. Ct. 876, 898 (2010); see also Buckley, 424 U.S. at 14-15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."). "For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence." Citizens United, 130 S. Ct. at 898.

Indeed, so strong is the protection of political speech that the Court recently indicated that "it might be maintained that political speech simply cannot be banned or restricted as a categorical matter." Id. However, the Court stopped short of placing a categorical ban on political speech restrictions, choosing instead to examine laws burdening political speech under "strict scrutiny." Id. Thus, we only permit restraint of judicial political speech where, after strict scrutiny of the regulation, it is found to "advance[] a compelling state interest and is [found to be] narrowly tailored to serve that interest." White II, 416 F.3d at 749. We measure the narrowness of tailoring by looking to the "factors of relatedness between the regulation and the stated government interest." Id. at 751.

---

personal solicitation of campaign funds unconstitutionally validates just such a government prohibition. Likewise, Judge Loken's reference to "a proper level of strict scrutiny" through this limitation on campaign speech illuminates the failure of Appellees to bear their burdens of proof and persuasion on the solicitation issue–that is, have Appellees satisfied strict scrutiny (as defined and applied by the Supreme Court in White I) or not? See Brown v. Entm't Merch. Ass'n, 131 S. Ct. 2729, 2738-39 (2011) (noting that the government must show a "direct causal link" between its regulation and the purported harm it seeks to avoid and that the state "bears the risk of uncertainty" and "ambiguous proof will not suffice").

"When the government restricts speech, the government bears the burden of proving the constitutionality of its actions." United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 816 (2000). Here, Appellees have the burden to prove that their restraints address a compelling state interest, and are narrowly tailored to serve that interest. White I, 536 U.S. at 774-75. Ultimately, "[s]trict scrutiny is an exacting inquiry, such that 'it is the rare case in which . . . a law survives strict scrutiny.'" White II, 416 F.3d at 749 (alteration in original) (quoting Burson v. Freeman, 504 U.S. 191, 211 (1992)).

It is abundantly clear that the restrictions at issue in this dispute collectively limit Wersal's political speech and his right to associate with others who share common political beliefs and aims. Thus, such restrictions may be validated only if they address a compelling state interest and then only after being subjected to narrow tailoring as defined by well established judicial precedent. Both Appellees and the plurality and concurrence correctly concede that "strict scrutiny" must be applied to each interest and regulation contested in this dispute. See ante at 15, 36-37.

It is equally clear that in carrying out its First Amendment tasks, this court is neither charged with, nor empowered to, override Minnesota's constitution or its legislative enactments unless, of course, as in this case, they are at odds with the United States Constitution.[26] Nor are we to become affirmatively involved with the maintenance of, or enhancements to, wide-ranging, broadly focused and factually unsupported general inquiries into the institutional equanimity, probity or integrity of Minnesota's judicial system as it may be viewed by the public in general. This is especially true if such effort and inquiry substantially disregards a judicial candidate's

---

[26]"'If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles.'" White I, 536 U.S. at 788 (alteration in original) (quoting Renne v. Geary, 501 U.S. 312, 349 (1991) (Marshall, J., dissenting)).

First Amendment rights, as the work product of Appellees and the affirming opinions do today.  See ante at 17-22.

In Carey v. Wolnitzek, 614 F.3d 189 (6th Cir. 2010), our colleagues on the Sixth Circuit Court of Appeals, with almost absolute precision, circumscribe the ambience in which we must review the issues in this appeal.  The Carey court states, "[i]n modern America, judicial elections are no less relevant to the public policy concerns of the citizenry than legislative elections, and the First Amendment protects electioneering speech in the one context as vigorously as it does in the other."  Id. at 193.  The court then says, "[a] State cannot simultaneously insist that judges be held accountable to the electorate at regular intervals but deny to sitting judges and candidates alike the communicative tools for explaining how they will be held to account."  Id.  And finally, and in my view, most importantly, the Sixth Circuit notes that,

> [t]oday . . . we have a speech restriction aimed not at judges performing court functions but at judges and judicial candidates making campaign statements or solicitations outside of court and outside of the process of deciding cases in their official capacity–all for the purpose of communicating information to voters about whom they should elect.

Id. at 200.  Because of this focus, my concern is solely with the effect the challenged clauses have on judicial candidates.

Accordingly, nothing in this dissent should be taken as any measure of disrespect for the probity, fairness and integrity of the courts of Minnesota in general. It is my view, but a view not presented for purposes of critique, that outside the framework of a judicial election, at least some portions of Minnesota's Canons of Judicial Conduct may arguably be examinable at some lesser level than the strict scrutiny evaluations mandated by the "fullest and most urgent" levels of the First Amendment applicable to Wersal's claims.  Buckley, 424 U.S. at 15.

-53-

## II. DISCUSSION

### A. Wersal's Electioneering Activities

Stripped to the bare essentials, Wersal seeks to be free to endorse other candidates for public office–judicial or otherwise. He also wishes to personally solicit or accept financial contributions for his campaign (within the legal limits established by the State of Minnesota and subject to all pertinent reporting requirements for campaign contributions), from any qualified contributor, individual or organization. He wants to be free to solicit funds for other political organizations or candidates if he believes that such activities may benefit his own name recognition, financial well-being and electoral needs.

In its attack on the justiciability of Wersal's challenge to Rule 4.1(A)(4)(a)–which prohibits a judge or judicial candidate from soliciting funds for a political organization or candidate for public office–the plurality contends that Wersal only seeks to "solicit[] funds for his own campaign," ante at 13, and he can do that. This is a substantial misstatement of the record. Indeed, the plurality, after identifying several candidates, states "Wersal desired to publicly voice his support for the [listed] candidates through public statements, yard signs, phone calls, endorsement letters, and letters to potential contributors [to the candidates and their sponsoring organizations.]" Ante at 10. These activities proposed by Wersal and restricted by the Appellees are, of course, constitutionally authorized mine-run election activities that may redound, directly or indirectly, to the benefit of his campaign. Accordingly, Wersal's challenge is justiciable.

Wisely, the Appellees and the plurality do not contend that any of Wersal's proposed campaign conduct in and of itself is not protected by the Constitution, especially the speech and associational conduct. As earlier noted, Wersal's proposed campaign practices are "the very stuff of the First Amendment," White II, 416 F.3d

-54-

at 748, and are routine in elections to public office. Accordingly, under well established constitutional precedent, such activities may be limited, displaced, attenuated or prohibited by government regulation only if the regulation is narrowly tailored to the advancement of a carefully defined "compelling state interest." Id. at 749. In other words, only after careful and concise identification of a compelling state interest by the Appellees may Wersal's constitutionally authorized election activities be regulated at all, but, even then, only in the narrowly tailored manner authorized by the Supreme Court in White I.

## B.    Strict Scrutiny

The plurality and concurrence correctly concede that "strict scrutiny" is required in the evaluation of all interests, regulations and prohibitions disputed in this case.[27]    As earlier noted, "political speech–speech at the core of the First Amendment–is highly protected." White II, 416 F.3d at 749; see also Rutan v. Republican Party of Ill., 497 U.S. 62, 69 (1990) (alteration in original) (quotation omitted) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."). Accordingly, any regulation which curtails such speech violates the Constitution unless it can withstand strict scrutiny review.

---

[27]While arriving at the correct conclusion, the plurality cites Siefert v. Alexander, 608 F.3d 974 (7th Cir. 2010), cert. denied, 131 S. Ct. 2872 (2011), in an apparent attempt to mitigate the requiring of strict scrutiny in this case. In Siefert, a split panel of the Seventh Circuit (whose decision led to a published dissent to the denial of rehearing en banc signed by four judges, 619 F.3d 776 (7th Cir. 2010)) misreads or disregards several of the mandates of White I. After doing so, the Siefert panel, advancing a difference without a distinction, classifies two types of election speech into categories of greater and lesser importance, contrary to well established judicial precedent. Then, importing Supreme Court cases regulating public employee speech balanced against the efficient operations of government employers into the mix, the panel arrives at a relaxed scrutiny analysis of First Amendment protected speech. 608 F.3d at 985.

White II, 416 F.3d at 749. To survive strict scrutiny, as has been repeatedly stated, the state must "show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest." Id. This examination "is best described as an end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest." Id. at 750.

To determine whether an interest (the end) is "important enough" to justify the abridgement of core constitutional rights, we examine the regulation (the means) purportedly addressing that end. Id. If the interest is sufficiently compelling, then we ask whether the regulation (the means) used to meet that end is "narrowly tailored to serve that interest." Id. at 751. Determining whether a regulation is narrowly tailored requires an examination of several related factors. As we stated in White II,

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

Id. In other words, a regulation which burdens political speech will only withstand constitutional scrutiny if it is "as *precisely* tailored as possible" to meet a very important end. Id.

In applying strict scrutiny to the circumstances of this dispute, I agree with the plurality and presume that guarding against judicial bias for or against either party to a proceeding is a "compelling state interest." On the other hand, I disagree with the plurality when it says that "the perception the [general] public maintains regarding the judiciary's lack of bias for or against either party to a proceeding," ante at 19 (citing Caperton, 129 S. Ct. at 2266), is a separate, viable compelling interest. But,

-56-

for the limited purpose of consideration of Appellees' contested regulations, I assume that it is.

Judge Loken, in the concurrence, purported to discern yet another separate and distinct "compelling state interest," described by him as "judicial independence." I likewise believe that no such interest exists within the framework of any judicial election required by the Minnesota Constitution. But again, for the limited purpose of considering Appellees' contested regulations, I assume that it does.

Applying such presumption and assumptions, I conclude that the three regulations imposed upon Wersal by the Minnesota Supreme Court are wholly unconstitutional. I discuss each regulation in comparison with each compelling interest in order.

## C.  Compelling State Interest

The scrutiny of the contours of a "compelling state interest" as articulated by the government and "strict scrutiny" of a regulation promulgated by the government in derogation of First Amendment rights often overlap. But, without the initial identification of a compelling state interest that provides the raison d'etre[28] for the regulation in the first place, a candidate's constitutional electioneering should be able to proceed uninhibited. At the outset, "[t]he State must specifically identify an 'actual problem' in need of solving." Brown v. Entm't Merch. Ass'n, 131 S. Ct. 2729, 2738 (2011) (quoting Playboy, 529 U.S. at 822). "[A]nd the curtailment of free speech must be actually necessary to the solution." Id. Also, clarity of meaning "is essential before we can decide whether [an asserted interest] is indeed a compelling state interest." White I, 536 U.S. at 775. Accordingly then, of necessity, our review must commence with the compelling interest inquiry.

---

[28]A French term meaning reason or justification for existence.

### 1. Actual Bias

As in White I, Appellees advance judicial impartiality, divided into several subtexts, as compelling interests.  Because several of the claimed interests were explicitly rejected by the Supreme Court in White I and by this court in White II, the plurality rightly disregards them and fully defines and advances for consideration the only impartiality interest that has been specifically validated by the Supreme Court.  "'[I]mpartiality' in the judicial context–and of course its root meaning–is the lack of bias for or against either *party* to a proceeding"–the actual bias interest.  Id.; see also White II, 416 F.3d at 753-54.  I agree with the plurality that this "actual bias" formulation captures a compelling state interest.  And, it is, as I explain shortly, the only "compelling state interest" truly at work in this dispute.  While the actual bias interest may be underinclusive as applied, and thus not truly compelling, that is an issue that I later discuss in more detail.

But, I digress momentarily.  Make no mistake about it, there is one additional compelling state interest involved here.  It is an interest established by the electors of Minnesota in the state's Constitution–not by the Minnesota Supreme Court–and it remains unmentioned in the plurality.  It is the state's overriding obligation to conduct judicial elections that pass constitutional muster.  Minn. Const. art. 6, § 7.

### 2. Perceived Bias

Through rhetoric often employed to advance the concept that "judicial elections are different," see, e.g., Peterson, 490 N.W.2d at 424, the plurality seeks to create from scratch a "compelling state interest" almost wholly untethered to any apposite judicial precedent, express or implied, and wholly unsupported by evidence that such interest is in fact compelling, at least within the context of a Minnesota judicial election protected by the mandates of the First Amendment.  And, as earlier noted, the burden of proof and production rests squarely upon the Appellees.

-58-

In this quest, the plurality segues from the Supreme Court's clearly limited "party to a proceeding" judicial bias definition to the plurality's newly birthed "implied visualization" definition dedicated to "preserving the appearance of [judicial] impartiality" in the eyes of the *general public,* an interest, says the plurality, "separate and distinct from the state's interest in preventing actual bias." Ante at 17. This new interest is explained by the plurality as "the perception the *public* maintains regarding the judiciary's [necessary] lack of bias for or against either party to a proceeding." Id. at 19 (emphasis added). The supposed interest does not by definition require a particularly identifiable judicial officer, reasonably knowable parties, (except, perhaps, any member of the general public), or even a venued proceeding of any kind. The plurality's new interest seems to be a "we think the public will not like the looks of this kind of activity" sort of thing. Aside from the insurmountable obstacles presented by "burdens of proof," "narrow tailoring" and "strict scrutiny" as these factors have been identified, defined and imposed by the Supreme Court, the precedent advanced by the plurality in support of its newly minted appellation are more than substantially unavailing.

The plurality contends that,

> White I and White II both implied [that] preserving the *appearance* of impartiality [apparently in the minds of the public] constitutes a compelling interest, separate and distinct from the state interest in preventing actual bias. See White I, 536 U.S. at 776 (analyzing the tailoring of the announce clause to the state's interest in impartiality "or the appearance of impartiality"); White II, 416 F.3d at 755, 758-59 (discussing the tailoring of the partisan-activities clause as it related to Minnesota's interest in the appearance of impartiality).

Ante at 17.

Perhaps the plurality has forgotten that the announce clause, White I, 536 U.S. at 776; and the partisan activities clause, White II, 416 F.3d at 756, referred to above,

-59-

(and also an earlier version of the solicitation clause, id. at 766), have been deemed unconstitutional. Of even more importance, there is a total dearth of words surrounding either citation that supports the plurality's supposed implication. Indeed, the language is to the contrary. In this regard, the Supreme Court states, for instance, "[w]e think it plain that the announce clause is *not* narrowly tailored to serve impartiality (or the appearance of impartiality)" in the sense of judicial bias in a specific judicial proceeding. White I, 536 U.S. at 776 (emphasis added). And, applying strict scrutiny, a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." Id. at 780 (quotation omitted). Nowhere within this above-quoted language or anywhere else in White I is there even a hint that the Supreme Court supports the plurality's conclusions.

Likewise, none of the cases cited by the plurality in support of this new interest actually involve a ballot contest protected by the First Amendment. Buckley, 424 U.S. 1, deals with political contributions and funding limits imposed by the Federal Election Campaign Act of 1971, not any specific election or group of elections. And, Mistretta v. United States, 488 U.S. 361 (1989), discusses the constitutionality of federal sentencing guidelines and judicial branch participation on a sentencing commission. In re Murchison, 349 U.S. 133 (1955), concerned Michigan's use of its so-called one-man grand jury act and says nothing pertinent to judicial elections and the First Amendment. And, finally, Caperton v. A.T. Massey Coal Co., 129 S. Ct. 2252 (2009), concerned "extraordinary" campaign contributions made to an elected judicial candidate who later ruled on an appeal of an action in which the contributor in question was a party. The case in no way sought to regulate a judge's First Amendment campaign rights. It is also important to note that all cases cited by the plurality, except Caperton, were decided well before the Supreme Court reminded us in White I that judicial elections actually are no different than all other election contests, except in the most limited of circumstances. Id. at 2264-65.

-60-

While the Appellees and the plurality yearn for a factual or textual anchor for this newly minted interest, there is none. Applicable text, as exemplified by the Minnesota Constitution (requiring election of judges), the First Amendment (applying free speech protections in judicial elections) and Minnesota's Code of Judicial Conduct, Rule 2.11 (defining and requiring disqualification), runs in the opposite direction. They all demand a specific proceeding, a specific judge and discernible, not speculative, adversaries.[29]

The plurality attempts to override this contrary textual material with multi-faceted emanations from the American Bar Association's Model Judicial Code and writing from the publish-or-perish world of legal academia. Ante at 19-22. None of these writings, of course, directly discuss Wersal's concerns in the context of judicial elections protected by the First Amendment.

The plurality makes no real attempt to factually support or precisely define its "public perception bias" claim in the context of judicial elections, except, of course, in broad, general and imprecise (and often confusing) articulations, and without focused judicial precedent. The plurality says,

> actual impartiality concerns the mental state of a particular judge, whereas the appearance of impartiality arises from the public's perception of that judge . . . the appearance of impartiality often stems from the collective awareness of the public . . . . Instead of aiming to protect the due process rights of actual parties to a case, maintaining the appearance of impartiality is systemic in nature, as it is essential to protect the judiciary's reputation for fairness in the eyes of *all citizens*.

---

[29]The same also applies to the requirements of 28 U.S.C. § 455, the federal courts disqualification statute.

<u>Ante</u> at 19-20 (emphasis added). So far so good if you are intent on disregarding a *judicial candidate's* tangible and well established First Amendment protections in deference to an unproven "collective awareness" of the public's implied visualization. <u>Id.</u>

The inclusion of the public as a whole into this "perceived bias" interest changes the entire dynamic of determining through strict scrutiny whether such an interest exists, or not. This is because the interest purports to insert itself into the "collective awareness" of the Minnesota public in protection of the Minnesota judiciary's reputation for "fairness [lack of perceived bias] in the eyes of all [Minnesota] citizens"–not simply a specific party allegedly suffering actual bias in an identifiable judicial proceeding. <u>Id.</u> This, then, opens the interest to the public's view of every facet of Minnesota's judicial election process and is the antithesis of the narrow tailoring required by strict scrutiny. This is so because such "collective awareness" will certainly not be garnered from the actions of judicial candidates alone but from a plethora of judicial election related actions undertaken by a broad range of entities and individuals participating directly and indirectly in the judicial electoral process–candidates, campaign committees, lawyers, law firms, contributors, solicitors, endorsers, supporters, opponents, the press and others too numerous to mention. But, the Minnesota Supreme Court has chosen to protect this "perceived bias" interest against only the actions of "judicial candidates." As a result, this interest addresses so few of the influences at work that it is woefully underinclusive. The interest as protected by only the offending clauses at issue leaves so many stones unturned that the interest cannot be, in any sense, considered compelling. This underinclusiveness is fatal to the sustainability of this purported interest as fabricated by the Appellees.

In <u>White II</u>, we said that a clear indicator of the degree to which an interest is compelling is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address *significant influences* that impact the

-62-

purported interest, it usually fleshes out the fact that the interest does not rise to the level of being "compelling."  White II, 416 F.3d at 751.

This idea–that underinclusiveness suggests that a purportedly compelling interest is not so compelling after all–has support in Supreme Court precedent.  See City of Ladue v. Gilleo, 512 U.S. 43, 52 (1994) (noting that underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech"); see also, Eugene Volokh, Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny, Essay, 144 U. Pa. L. Rev. 2417, 2420 (1996) ("A law's underinclusiveness–its failure to reach all speech that implicates the interest–may be evidence that an interest is not compelling, because it suggests that the government itself doesn't see the interest as compelling enough to justify a broader statute."). More specifically, the Court has reasoned that, even if an interest is potentially compelling in the abstract, underinclusiveness suggests it is not a compelling interest that the state has chosen to pursue.  White I, 536 U.S. at 779-80.

As I review the plurality's perceived bias interest, I note that the opinion purports to apply the interest to both the endorsement clause, ante at 24-25, and the personal solicitation clause, ante at 33.  The plurality makes no attempt to consider the organization and candidate solicitation clause because of its erroneous affirmance of the district court's earlier conclusion that Wersal's challenge to that clause was not justiciable.

However, discussing the first two rules will abundantly prove my point.  While a judicial candidate is precluded from endorsing or opposing another candidate for election to a particular office, it appears that a judicial candidate may approve or disapprove of another candidate's job performance, campaign platform, point of view on an issue, prior opinions, campaign communication, or any other communication on any subject.  Further, a judicial candidate may seemingly endorse or oppose any individual for any office so long as such endorsement or opposition comes prior to

the filing of that individual as a candidate for the office. A judicial candidate may solicit and receive endorsements from, or be publically opposed by, lawyers, office holders and entities of any description, and from non-lawyers, even those who are frequent litigators in the courts of Minnesota. How Appellees' perceived bias interest can escape being influenced by these unregulated actions is not explained by either the Appellees or the plurality.

The matter of personal solicitation of funds by a candidate is an even more startling example of underinclusiveness when directed against this perceived bias interest. The personal solicitation clause is premised upon the candidate not becoming aware of who gives and who does not give to his or her campaign, a false concern at best as I will explain shortly. But, Minnesota requires detailed reporting of contributions to judicial candidates including name, address and occupation of the contributor and, of course, the identification of the candidate. Election officials publish this information and the media reports upon compiled information, often and in detail. The rules do not and, indeed, could not preclude the public from knowing who gives to a candidate, or how much and how often. The public reports disclose that lawyers and their firms are by far the largest and most persistent contributors to judicial candidates, especially incumbent judges seeking re-election as noted earlier. The reports also disclose that organizations and non-lawyer individuals who are public figures and, sometimes, frequent litigators or representatives thereof, may also be contributors. The Minnesota Supreme Court, of course, does not and cannot constitutionally or statutorily shield the general public referred to in the perceived bias interest from this information. And the court provides no discipline for a judicial candidate who purposely or inadvertently reads or hears of these reports. It is the Appellees' and the plurality's illusion, not the public's, that Minnesota citizens do not possess knowledge that lawyers–who, of course, have more than a passing economic interest in the operations of the Minnesota court system, and who are often an incumbent judicial candidate's larger and more persistent contributors–make substantial contributions to candidates and that this information is somehow less

damaging to the perceived bias interest than a judicial candidate's knowledge of who gave or did not give to his or her campaign.

Finally, and importantly, the personal solicitation clause presents an obvious matter of underinclusiveness not discussed by the Appellees or the plurality. And the matter is of substantial import to both the existence of a compelling interest and the scrutiny of the regulation. The clause prohibits Wersal's core political speech as he goes door-to-door soliciting campaign contributions from non-lawyers (and from lawyers as well for that matter).[30] And, as earlier noted, the premise of this limitation is the shielding of the candidate from knowledge of who contributes and who says no. This, says the Appellees, avoids the accrual of bias on the part of the candidate, if elected, for or against a party or a potential party to any proceeding. But neither this nor any other clause precludes Wersal from going door-to-door seeing the same individuals to ask for their vote or a pledge of their vote on election day. And, some will almost certainly say yes and others will probably say no, or not respond. As a matter of accrual of bias for or against any individual, it is difficult, if not impossible, to distinguish the difference between the contribution request and the vote-for-me request. It is true that the money may be used for political advertising that reaches many more potential voters than the labor-intensive task of door-to-door vote solicitation. But, remembering who said yes and who said no at the time is unlikely in the extreme.

Given that more voters may be reached by the campaign advertisement than the door-to-door vote solicitation campaign, a pessimist or a skeptic might be inclined to believe that the money solicitation prohibition is a much more effective deterrent to a successful election campaign by a non-incumbent than the more time-consuming door-to-door vote-for-me request. In sum, the plurality's statement that "we easily conclude [from its listed sources that] Minnesota's interest in preserving [through

---

[30]See Ante n. 23.

Appellees' regulations] the appearance of impartiality [in judicial elections protected by the First Amendment] is compelling," ante at 22, is simply wrong. Indeed, the purported compelling interest based upon a public perception of bias is, at best, substantially underinclusive, contrafactual, generalized, speculative, presumptive, abstract and spun from the thinnest of constitutional gossamer.

### 3. Judicial Independence

Judge Loken correctly rejects Judge Bye's "impartiality interests" through which Judge Bye upholds the constitutionality of the Appellees' endorsement restrictions. Even as he does so, however, he concurs in a judgment that enforces the endorsement regulation. His concurrence, interestingly, proceeds via the adoption of a separate, narrow and "distinct" interest, one labeled "judicial independence." Judge Loken makes little effort to define or even set forth discernible contours for this interest. He articulates no "direct causal link" between the endorsement regulation and the purported harm he seeks to avoid as required by Brown, 131 S. Ct. at 2738. He quotes Alexander Hamilton's summarization of the importance of judicial independence[31] and an op-ed piece by columnist George Will. Ante at 39.

Judge Loken appears to find support for his judicial independence interest because it "was not considered by the Supreme Court in deciding [White I]," ante at 39. Embracing, I presume, the inference that because the Court did not deal with the issue when presented by the Appellees in the course of White I, it obviously remains a viable and established interest for present consideration. But, the value of this

---

[31]Mr. Hamilton's quote from The Examination was uttered in defense of the judicial Article in the United States Constitution when the Article was under attack in 1802. I suspect a very high percentage of the judicial officers of the United States would vocally support and prefer a judicial appointment with life tenure upon good behavior such as Hamilton was defending. But, no involvement of a judicial election with First Amendment protections was at issue at the time.

-66-

happenstance is refuted by the Supreme Court's recent opinion in Howes v. Fields, 132 S. Ct. 1181 (2012). In Howes, the Court of Appeals adopted a per se rule of "custody" for a prison inmate, relying upon the Supreme Court's earlier statement in Maryland v. Shatzer, 559 U.S. ___ (2010), that "[n]o one questions that Shatzer was in custody for Miranda purposes." Howes, 132 S. Ct. at 1188 (alteration in original). But the Court summarily rejected such a conclusion saying "[i]t strains credulity to read the statement as constituting an 'unambiguous conclusion' or 'finding' by this Court that Shatzer was in custody." Id. Indeed, what White I *actually* said should be embraced by this court, not what it did not say.

Finally, Judge Loken contends that "[a] judicial candidate's endorsement of a candidate for executive or legislative[32] office does more than indirectly announce the judicial candidate's views on particular issues." Ante at 40. I agree. But, endorsements do, as Judge Loken concedes, very effectively announce ideas that are intended to benefit the judicial aspirant. Why this clearly constitutional "announce" capability should be stifled in favor of Judge Loken's so-called judicial independence interest is not explained.

A judicial candidate's endorsement of an executive or legislative candidate, as the Judge Colloton opinion cogently explains, usually benefits the endorsee more than the endorser. So, in that sense, any such endorsement makes quid pro quo bias in favor of or against anyone directly involved very unlikely.

I concede, however, that a judicial endorsement of a legislative or executive candidate may garner benefits for the judicial candidate, albeit in a remote and almost immeasurable way. The judicial candidate's endorsement may favorably influence voters friendly to the endorsed candidate. If, for instance, the electorate favorably

---

[32]Judge Loken says nothing about the endorsement of the judicial candidates Wersal wished to make, a matter I will later discuss.

views the moral, intellectual, ethical, vocational, experiential or religious propensities of the candidate endorsed by the judicial candidate, it may redound to the benefit of the judicial aspirant. It may, on the other hand, redound to the endorsing candidate's detriment. But, nonetheless, this is First Amendment protected electioneering activity that may only be limited by application of the narrow tailoring inquiry required by strict scrutiny. The question then becomes does this ambiguous and virtually immeasurable benefit somehow support the existence of a *compelling* state interest? I think not. At least, Appellees have not presented direct evidence (or any other evidence), as the Supreme Court requires, that the purported interest addresses a problem "in need of solving." Brown, 131 S. Ct. at 2738. But, if it does, the regulation almost certainly fails the narrow tailoring test.

### D.    Narrow Tailoring

### 1. The Endorsement Clause

The endorsement clause prohibits a judicial candidate from "publicly endors[ing] or, except for the judge or candidate's opponent, publicly oppos[ing] another candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(3).[33] This restriction depends wholly upon the subject matter of the speech for its invocation. Candidates are not barred from talking about other candidates for any purpose other than endorsing or opposing them. "Restricting speech based on its subject matter triggers the same strict scrutiny as does restricting core political speech." White II, 416 F.3d at 763-64.[34] As we noted in White II:

---

[33] Wersal only challenges the "endorsement" provision of the clause.

[34] Appellees argue that endorsements are not necessary to run an effective campaign. Such an inquiry, however, is irrelevant as to whether restricting endorsements burdens core political speech. Instead, the inquiry is whether the infringed expression would communicate *relevant* information to the electorate. See

"[A] candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known [and associate with like-minded persons] so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandeis' observation that in our country public discussion is a political duty, applies with special force to candidates for public office . . . . [T]he First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak [or associate] without legislative limit on behalf of his own candidacy."

416 F.3d at 757 n.8 (alterations in original) (quoting Buckley, 424 U.S. at 52-54). Thus, the endorsement clause burdens political expression because it impairs a candidate's ability to vigorously advocate the election of other candidates whose success may also benefit the candidate, associate with like-minded candidates, and, thus, vigorously advocate his or her own campaign. Such a burden on political speech triggers strict scrutiny. Citizens United, 130 S. Ct. at 898; see also White II, 416 F.3d at 748-49.

### a. Actual Bias

The notion of lack of actual bias "assures equal application of the law" because it "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." White I, 536 U.S. at 776. Thus, the question is whether the endorsement clause is narrowly tailored to meet this interest.

---

White I, 536 U.S. at 782 ("We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.").

The Appellees contend that the endorsement clause is narrowly tailored to serve Minnesota's compelling interest in impartiality articulated as a lack of bias for or against parties to a case. According to the Appellees, endorsements pose a particularly acute danger to impartiality defined as actual judicial bias because a public endorsement for a candidate *may* indicate a judicial candidate's bias towards the endorsed party. Thus, argue the Appellees, the endorsement clause is, of necessity, a broadly applied constitutional evil designed to protect potential litigants from such a display of favoritism by the judicial candidate should he or she be elected. As a result, the blanket prohibition is needed to keep constitutional campaign speech from numerous citizens who will never be a "party to a proceeding" at all. I disagree. The Appellees' endorsement clause is almost a perfect paradigm of overinclusiveness. It is also a perfect example of when recusal, as opposed to a blanket prohibition, is the necessary and appropriate remedy for actual bias or even the appearance of bias on the part of a judicial officer in an identifiable proceeding.

"The question under our strict scrutiny test . . . is not whether the [endorsement] clause serves [the] interest *at all*, but whether it is *narrowly tailored* to serve [the particular] interest." Id. at 777 n.7 (emphasis in original). The Appellees' endorsement clause clearly fails this test.

Endorsing a well-known candidate is often a highly effective and efficient means of expressing one's own views on issues. From one simple statement the judicial candidate can announce his or her own views on a myriad of matters. Furthermore, association with other like-minded candidates may well draw volunteers, votes and money from the endorsed candidate's supporters and contributors. As earlier noted, Wersal sought to endorse and thus associate with Tim Tinglested, candidate for Associate Justice of the Minnesota Supreme Court, Glen Jacobsen, candidate for Minnesota District Court Judge, and Michele Bachmann, candidate for United States Congress. The chances of any of these individuals, or others similarly situated, ever becoming a party in a proceeding in Wersal's court,

should he be elected, are between slim and none. And if, perchance, such a situation should occur, Appellees have a remedy in place, that is the disqualification rule, 2.11, in the Code of Judicial Conduct.[35]

The plurality, and the Seventh Circuit panel in <u>Siefert</u>, seem specifically troubled by the notion that a judicial candidate might endorse, for instance, candidates for sheriff and county attorney–persons who are likely to repeatedly appear as litigants or representatives of litigants in Minnesota courts, especially in smaller judicial districts or divisions in the state. But, the clause is not so cabined. It prohibits endorsements regardless of the likelihood that the endorsee will ever appear as a party in the state's courts. Given that the state's compelling interest in preserving an actual lack of bias extends only to preventing bias for or against a *party to a proceeding*, <u>White I</u>, 536 U.S. at 775, the endorsement clause easily restricts more speech than necessary to serve that asserted interest. But, candidly, such conflicts do not arise only in the election context. Conflicts involving family members, former legal associates, business associates, personal investments or former political offices are continuously under consideration, usually through Rule 2.11. The prosecutor and sheriff are more likely examples of an excuse for, not a reason to create, First Amendment limitations.

---

[35]Rule 2.11(A)(1) provides:

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:

(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 2.11(A)(1).

-71-

If the Appellees' endorsement clause is truly dedicated to the proposition that there should always be an actual or perceived unbiased judge in every proceeding, it is also almost wholly underinclusive. First, referring to Appellees' concerns about the judicial candidate endorsing candidates for sheriff and county attorney. What if, on the other hand, these candidates or office holders endorse the judicial candidate? The clause only prevents, and could only prevent, a judicial candidate from endorsing other *candidates* for public office, not other candidates endorsing a judicial candidate. Yet the measure of judicial bias would be the same in the eyes of anyone not making or receiving an endorsement. Also, as earlier noted, a judicial candidate may endorse a public official or a potential candidate for office so long as the endorsee has not yet officially filed for office. Moreover, the endorsement clause does not prohibit a candidate from endorsing the acts and policies of other well-known non-candidates and organizations, no matter the likelihood of their becoming litigants in a case before the court–that is business organizations, labor unions, the American Civil Liberties Union or any public official not running for office at the same time as the judicial candidate.

Under the Appellees' and plurality's supposed standards, another important category of endorsements that could lead to actual bias or perceived bias by a party to a proceeding is left untouched. Lawyers and private citizens are not precluded from and often do, I believe, occupy publically known positions on a judicial candidate's committees–indeed committees are required by the Appellees' rules. This participation is, at least, tacit endorsement of the judicial candidate and often involves public endorsements of one kind or another. The limitations placed upon judicial candidates by the endorsement clause fail to touch these sources of potential bias. Thus, the clause's underinclusiveness belies its purported, but substantially ineffective, purpose of preserving impartiality defined as a lack of bias for parties to a proceeding or the appearance of bias by members of the general public.

Finally, as extensively alluded to earlier, a categorical ban on endorsements is not the least restrictive nor the most effective means of limiting bias for or against a party or appearance of such bias in a particular proceeding. Instead, where an individual or organization who receives a judge's endorsement or campaign contribution appears before that judge, "recusal is the least restrictive [and best] means of accomplishing the state's interest in impartiality articulated as a lack of bias for or against parties to the case." White II, 416 F.3d at 755. In fact, "[t]hrough recusal, the same concerns of bias or the appearance of bias that Minnesota seeks to alleviate through the [endorsement] clause are thoroughly addressed without 'burn[ing] the house to roast the pig.'" Id. (third alternation in original) (quoting Butler v. Michigan, 352 U.S. 380, 383 (1957)). That Rule 2.11 requires a judge to disqualify (recuse) "himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," is evidence of that fact. 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 2.11(A). And, "[c]oncern about the mere *appearance* [or possibility] of bias is also addressed by recusal." White II, 416 F.3d at 755 (second alteration in original). This is because in Minnesota, "[t]he controlling [recusal] principle is that no judge . . . ought ever to [hear] the cause of any citizen, *even though he be entirely free from bias in fact*, if circumstances have arisen which give a bona fide appearance of bias to litigants." In re Collection of Delinquent Real Prop. Taxes, 530 N.W.2d 200, 206 (Minn. 1995).

Accordingly, the endorsement clause is not narrowly tailored to serve any interest in electing unbiased judges and it is clearly not the least restrictive means of doing so. Thus, the clause fails strict scrutiny.

### b. Perceived Bias

The endorsement clause when examined in the context of creating a "perception of the public concerning the judiciary's lack of bias in a particular

proceeding" is an even greater violation of the First Amendment than the "actual bias" clause.

The Appellees and the plurality offer nothing beyond unsupported speculation that the general public has any particular concern arising from a judicial candidate's endorsement of another candidate for public office. And, because of the sheer breadth of the regulation in the context of a supposed perception of bias by the members of the general public arising from a judicial candidate's endorsement or endorsements of other candidates for public office, this lack of evidence is crucial. While these evidentiary deficiencies track those discussed in my earlier evaluation of an actual bias interest, the endorsement clause's application to this supposed public interest is even more pernicious and unnecessary.

Indeed, in the context of the public as a whole being shielded from a perception of bias by the offending endorsement prohibition, the overinclusiveness is almost beyond measurement. The clause actually advances no compelling interest, is overinclusive to the extreme and is by far the most restrictive available alternative for eliminating perceived bias, even if a compelling interest might be discernible.

If a compelling interest in shielding a potential party to a judicial proceeding from judicial bias arising from a judicial candidate's endorsement of another candidate for public office actually exists, which is doubtful, the possibility of such accrual of such a perception of bias in the mind of a member of the general public is almost impossible. The chance that there is a member of the general public who (1) perceives the existence of a judge with a bias arising from the judge's endorsement, as a judicial candidate, of another candidate for public office, and (2) then later observes a proceeding in which the endorsed candidate for public office becomes an adverse party in the court of the judicial candidate who has by then been elected to office, is, while not impossible, highly unlikely. Additionally, the possibility of that member of the general public ever becoming a party to such a proceeding is possibly

-74-

akin to a person winning the national Powerball lottery on both Wednesday and Saturday for two or three successive weeks. This must be overbreadth.

And, even though I concede that underinclusiveness need not be further discussed, the endorsement clause's general prohibition, as written, is unnecessary in the extreme because Rule 2.11 is in place for the making of a judicial evaluation of disqualification if an analysis should become necessary. The perceived bias by the general public as argued by the Appellees and applied by the plurality runs to some broad concern for the equanimity, probity, and integrity of the court system as a whole, not from the possibility or probability of creating an actually favored party in a specific proceeding before a functioning judicial officer. The First Amendment rejects the plurality's conclusion and so do I.

### c. Judicial Independence

The endorsement clause restrictions are almost wholly untethered to the judicial independence interest advanced by the concurrence. Any real connection is not only almost imperceptible to the public but virtually immeasurable, at least by any means noted by the Appellees or the concurrence. Indeed, Judge Loken points to no showing by the Appellees that the simple act of endorsing another candidate for public office, especially another judicial candidate, which the clause also precludes, will directly (or even indirectly) undermine a sitting judge's judicial independence.

Almost all of the narrow tailoring shortcomings of the endorsement clause in relation to the plurality's purported "perceived bias" interest are applicable to this separately stated interest. But, the most serious flaw in the tailoring of the endorsement clause to this supposed interest is found in its overinclusiveness. Judge Loken concedes that the endorsement of another candidate can be, and usually is, an announcement concerning issues deemed important by the candidate to the election contest. So, the endorsement clause clearly serves to preclude a campaign practice,

announcing a candidate's views, specifically validated by <u>White I</u>. Thus, it is not possible to narrowly tailor the clause even in the face of a recognizable state interest, especially one so vague, ambiguous and undefinable as one generally labeled judicial independence. Finally, the clause precludes endorsement of another judicial candidate even though Judge Loken does not include such an endorsement in his discussion of the perceived interest or explain how judicial independence might substantially be undermined if this were to occur.

The clause is unconstitutional when applied to Judge Loken's interest, however compelling it might be.

### 2. Personal Solicitation Clause

Appellees' contribution limitation regulations operate within the most fundamental area of First Amendment activity. <u>Buckley</u>, 424 U.S. at 14. "This is because virtually every means of [political] communicating . . . requires the expenditure of money." <u>Id.</u> at 19; <u>see also</u> <u>White II</u>, 416 F.3d at 764. Accordingly, there is no argument whatever from the Appellees and the plurality that Wersal's solicitation of campaign funds is not fully protected by the First Amendment.

### a. Actual Bias

The personal solicitation clause prohibits a judicial candidate (Wersal) from "personally solicit[ing] or accept[ing] campaign contributions other than as authorized by Rules 4.2 and 4.4." 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(6). This regulation is, of course, unconstitutional unless it passes strict scrutiny as applied to a bona fide compelling state interest. But, it does not so operate. To explain why, I begin with a precursor regulation imposed by the Appellees. "Canon 5 provides specifically that all [campaign] contributions are to be made [payable] to the candidate's *committee*, and the committee 'shall not' disclose

to the candidate those who either contributed or rebuffed a solicitation. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. B(2)." White II, 416 F.3d at 765. Thus, the underlying premise of personal solicitation Rule 4.1(A)(6) is that if the judicial candidate is armed with this "give or not give" contribution information, the "actual bias" concern identified by the plurality is triggered and the compelling state interest it embodies–actual bias–is violated by the candidate. Under the circumstances, say the Appellees and now the plurality, the otherwise constitutional electioneering activity represented by the personal solicitation of campaign funds by a judicial candidate may be forbidden to protect the compelling state interest. But, Caperton counsels to the contrary, unless "extraordinary" circumstances exist. 129 S. Ct. at 2265. And, Caperton also counsels that under such extraordinary circumstances, recusal is the appropriate remedy, not total prohibition of the personal solicitation of campaign funds. Id.

In Caperton, Justice Benjamin, the judicial officer involved, knew that Blankenship, Massey's chairman, had made in excess of $3 million in contributions to his judicial campaign. The record does not disclose, but Benjamin may have personally solicited and received some of them, but whether he did or not is inconsequential to a constitutional analysis. The Supreme Court noted, "[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal." Id. at 2263. And, as I will explain shortly, if recusal of an informed judge about a contribution is not required, prohibition of his personal solicitation of campaign funds cannot, in my view, be constitutionally required.

Numerous state court cases echo the Caperton premise. See Bissell v. Baumgardner, 236 S.W.3d 24, 29 (Ky. Ct. App. 2007) ("[A] judge is not required to disqualify himself or herself based solely on an allegation that a litigant or counsel for a litigant has made a legal campaign contribution to the political campaign of the trial judge."); Adair v. State Dep't of Educ., 709 N.W.2d 567, 579 (Mich. 2006) ("That a judge has at some time received a campaign contribution from a party, an

attorney for a party, a law firm employing an attorney for a party, or a group having common interests with a party or an attorney, cannot reasonably require his or her disqualification."); MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332, 1335 (Fla. 1990) ("We conclude that an allegation in a motion that a litigant or counsel for a litigant has made a legal campaign contribution to the political campaign of the trial judge, or the trial judge's spouse, without more, is not a legally sufficient ground."). Storms v. Action Wisconsin Inc., 754 N.W.2d 480 (Wis. 2008), perhaps says it most completely: "There is no case in Wisconsin *or elsewhere* that requires recusal of a judge or justice based solely on a contribution to a judicial campaign." Id. at 487 (emphasis added) (quotation omitted). Neither have I found any such case. As explained in Caperton, it is truly axiomatic that no compelling state interest is served by a government prohibition of the knowing receipt and use of a campaign contribution when such receipt and use does not create, except in exceptional circumstances, a probability of judicial bias. Caperton, 129 S. Ct. at 2265. Indeed, one of Appellees' amici, former Minnesota Supreme Court Chief Justice A.M. (Sandy) Keith has been heard to agree with this, assuming Minnesota press accounts are accurate. Keith said

> he'd rather receive money from lawyers than from other sources.
> . . . [T]hey understand the need for an independent judiciary and don't
> expect anything in return. "There's hardly a lawyer I know personally
> that I haven't ruled against already in the 3 ½ years I've been on the
> court . . . . They know how the system works, that you don't come up
> here and win 'em just because you know somebody on the court."

Associated Press.

Thus, there is nothing extraordinary about Wersal receiving a personally solicited contribution to his campaign within the legal limits prescribed by Minnesota law and duly reported as required by state statute. But if anything extraordinary is found, as in Caperton, recusal is the only "necessary" remedy. And, the falderal from

-78-

the Appellees about how "unhandy" recusal may be in such cases is frivolous and *must* yield to the First Amendment protections that have repeatedly been pointed out in White I, White II, and other precedent cited in this dissent.

Finally, in this case there is even less cause to validate Rule 4.1(A)(6)'s prohibition. Wersal has, out of an abundance of caution, agreed to voluntarily disqualify himself in any case in which he acquires knowledge of the identity of a personally solicited campaign contributor.

In sum, a compelling state interest cannot emerge from campaign activity that does not produce the probability of judicial bias, and without a compelling state interest at work, government regulation of constitutionally protected election activity is, itself, unconstitutional. So, after Caperton, it seems unusual that the Appellees, on their own motion, would not have set about dismantling Rule 4.1(A)(6) as unnecessary.

### b. Perceived Bias

As with the candidate endorsement clause, Appellees have made no showing that any member of the general public has or will in the future perceive judicial bias arising from the constitutional act of soliciting and receiving an election campaign contribution. Again, as with candidate endorsements, a perceived bias developed by a citizen who is only peripherally involved in either the judicial election or the judicial process and is only remotely likely to become a party in a proceeding presided over by a particular judicial candidate should he or she be elected to office, is difficult, if not almost impossible, to comprehend. But, such is the stuff of the plurality's vaguely presented premise based upon absent proof of a reasonably defined "perception of bias" which in turn, responds to a compelling state interest.

### 3. Solicitation for a Political Organization or Candidate

A judicial candidate shall not "solicit funds for a political organization or a candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(4)(a). The plurality, through a faulty "ripeness" analysis, avoids any attempt to either explain or validate this limitation on Wersal's constitutionally protected judicial election activity. Accordingly, in turn, I do not address the Rule in detail. For the reasons outlined above in conjunction with the endorsement and personal solicitation clauses, activity prohibited by this rule clearly is protected by the Constitution. Indeed, soliciting campaign contributions for an endorsed candidate for public office would usually be, at least, simply an added form of endorsement. So whether evaluated for connection with a court-opinion-defined "compelling state interest" of either "actual bias" or "perceived bias," the Rule is unconstitutional.

## III. CONCLUSION

As Justice O'Connor said in White I:

> Minnesota has chosen to select its judges through contested popular elections instead of through an appointment system or a combined appointment and retention election system along the lines of the Missouri Plan. In doing so the State has voluntarily taken on the risks to judicial bias described above. As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.

536 U.S. at 792 (O'Connor, J., concurring).

In sum, as stated in the beginning, the Appellees' limitations are unconstitutional and must be enjoined. Accordingly, I dissent.

COLLOTON, Circuit Judge, with whom RILEY, Chief Judge, BEAM, GRUENDER, and BENTON, Circuit Judges, join, dissenting in part.

As in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) (*White I*), this case can and should be resolved in favor of the judicial candidate on the principal disputed issues without deciding whether "the First Amendment requires campaigns for judicial office to sound the same as those for legislative office." *Id*. at 783. Even assuming the Supreme Court declines to adopt Justice Kennedy's view that "content-based restrictions that do not fall within any traditional exception should be invalidated without inquiry into narrow tailoring or compelling government interests," *id*. at 793 (Kennedy, J., concurring), the endorsement clause and the personal solicitation clause of the Minnesota Code of Judicial Conduct fail to withstand strict scrutiny.

The endorsement clause, 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(3), eliminates one useful way for a judicial candidate to associate with other candidates for office and to communicate to the voters his or her outlook on issues of the day. The appellees' principal justification for the ban on endorsements is that it furthers a compelling interest in maintaining impartiality toward parties appearing before the judicial candidate if he is elected. But the rule is barely tailored to achieve this objective, and when an endorsement does frustrate the asserted state interest, the problem almost always can be remedied by recusal. This prohibition on political speech is thus not narrowly tailored to further a compelling government interest.

Despite the endorsement clause, a judicial candidate remains free to make positive statements about another candidate for office. At oral argument, counsel for appellees explained, by way of example, that the endorsement clause prohibits the

following language: "I endorse Michelle Bachmann for the U.S. Congress." Oral Argument at 40:14-40:24 (Jan. 10, 2011), available at http://www.ca8.uscourts.gov/ cgi-bin/new/cmECFArg.pl?case_num=09-1578. Judicial Candidate X, however, may announce that "I agree with Senator Y on all of the issues of the day." Judicial Candidate X may declare that "Senator Y has done an excellent job, and I am going to vote for Senator Y." *Id*. at 41:10-42:40, 46:00-46:07. And Judicial Candidate X may speak directly in favor of reelecting Senator Y as long as the speech comes before Senator Y officially becomes a "candidate" for reelection. Contrary to the plurality's suggestion, *ante*, at 28, these statements are not forbidden by Rule 4.1(A)(10), which applies only to statements that would impair "the fairness of a matter or impending matter." 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(10). Rule 4.1(A)(10) restrains the judicial candidate only in the event that Senator Y is a party to litigation that is pending or imminent in the court on which the judicial candidate would serve if elected. If the plurality were correct about the breadth of Rule 4.1(A)(10), then the endorsement clause would be superfluous.

To prohibit the judicial candidate from using the magic words of endorsement does not further the State's interest in maintaining the impartiality of judges in any material way. If a judicial candidate's formal endorsement of a legislator would establish disqualifying bias in favor of the legislator, then so too would numerous other statements of praise, support, or association that are not forbidden by the Code of Judicial Conduct. *See* Oral Argument at 42:40-42:53. The purported marginal value of forbidding a formal endorsement is not sufficient to constitute a "compelling" interest in maintaining impartiality.

Even assuming, in the alternative, that a formal endorsement creates a bias that is not generated by other permissible public statements, recusal is a less restrictive means of achieving the objective of judicial impartiality. The Supreme Court in *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2267 (2009); *id*. at 2268-69 (Roberts, C.J., dissenting), and Justice Kennedy in *White I*, 536 U.S. at 794 (Kennedy,

J., concurring), emphasized that States are free to adopt recusal standards more rigorous than the Due Process Clause requires. The appellees present hypothetical scenarios in which recusal would pose administrative difficulties, such as the rural trial judge who endorses the prosecuting attorney who regularly appears before the judge. But the endorsement clause is not targeted carefully at these scenarios. It broadly forbids all endorsements, no matter how unlikely that a candidate would ever appear in court before the judicial candidate, and no matter how simple it would be to remedy a problem of bias through recusal in a single, isolated instance. The breadth of the clause belies the assertion that the appellees are truly concerned about serious practical problems with recusal.

In support of its view that the endorsement clause is constitutional, the plurality mistakenly crafts an overbroad "party-issue" dichotomy based on the Supreme Court's distinction in *White I* between "speech for or against particular *parties*," and "speech for or against particular *issues*." 536 U.S. at 776. Based on this dichotomy, the plurality concludes that the appellees are free to ban speech by a judicial candidate for or against any other candidate for public office, because the speech is not aimed at an "issue," but rather at a "party." *Ante*, at 24-25. The announce clause at issue in *White I*, however, forbade speech only about issues that were "likely to come before the candidate if he is elected judge." 536 U.S. at 771. The Court's parallel reference to speech about "parties" must be understood likewise to mean, at most, speech about parties who are likely to come before the candidate if he is elected. The Supreme Court surely did not signal that a State is free to suppress a judicial candidate's speech about persons who are unlikely ever to set foot in a Minnesota courtroom.

The appellees' asserted interest in "judicial independence" also does not justify the prohibition on political speech. In my view, the opinion concurring in the judgment, *ante*, at 36, has it essentially backwards. In the real world of politics, the primary risk of "dependence" comes not from a judicial candidate's endorsement of

-83-

other candidates for public office, but from the judicial candidate's receipt of the endorsements of those who can deliver votes: political parties, unions, trade associations, powerful elected officials, leaders of demographic blocs, political interest groups, and the like. Candidates depend on these people and their endorsements for election to public office. The Russian judges described in the concurrence, *ante*, at 40-41, presumably would understand this phenomenon: they did not suspect that Justice Breyer engaged in telephone justice because *he* endorsed a powerful politician, but the other way around.

Yet Minnesota does not and could not forbid political actors from endorsing judicial candidates and working for their election. By opting for judicial elections, the people of Minnesota have determined that the benefits of making judges accountable to the people outweigh the risks that judges will be unduly dependent on political actors and will decide cases based on the wishes of "political cronies" who endorse them rather than on the rule of law. This is not the independent judiciary that the Founders envisioned for the federal courts, but neither is it a judiciary dependent on the King's will alone for tenure and subsistence, *see The Declaration of Independence* para. 11 (U.S. 1776), or on legislative fiat, *see Proceedings and Debates of the Virginia State Convention of 1829-30*, at 616, 619 (remarks of John Marshall). It is a judiciary that is dependent on approval of *the people*. Having chosen to accept a judiciary that is "dependent" in that sense, Minnesota cannot at the same time forbid political speech by judicial candidates on the ground that it creates the potential for a much more attenuated form of political dependence. Strict scrutiny *requires* the court to focus on the extent to which the endorsement prohibition accomplishes an asserted purpose, *White I*, 536 U.S. at 777 n.7; *cf. ante*, at 41-42 (Loken, J., concurring in the judgment), and the tailoring in this instance is anything but narrow.

The other interests asserted by the appellees and the plurality are insufficient to justify the endorsement clause. The commentary to the governing rule states that

the prohibition on endorsements by judicial candidates is designed "to prevent them from abusing the prestige of judicial office to advance the interests of others." 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1, cmt. 4. But the rule is not narrowly tailored to serve that interest, because it also applies to candidates who do not hold judicial office. *See White I*, 536 U.S. at 796 (Kennedy, J., concurring). And I agree with Judge Beam and Judge Loken that the plurality's reliance on an interest in "maintaining the appearance of impartiality," *ante*, at 19, is so broad and general that it would justify restrictions that were declared unconstitutional by the Supreme Court in *White I*, so it must be wrong.

The second clause at issue, the personal solicitation clause, 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(6), infringes on the ability of a judicial candidate to engage in speech to raise funds that the candidate believes are necessary to mount a competitive election campaign. As the Sixth Circuit recently observed:

> Prohibiting candidates from asking for money suppresses speech in the most conspicuous of ways and, in the process, favors some candidates over others—incumbent judges (who benefit from their current status) over non-judicial candidates, the well-to-do (who may not need to raise any money at all) over lower-income candidates, and the well-connected (who have an army of potential fundraisers) over outsiders. For these reasons, it is tempting to say that *any* limitation on a candidate's right to ask for a campaign contribution is one limitation too many.

*Carey v. Wolnitzek*, 614 F.3d 189, 204-205 (6th Cir. 2010). The panel in *Carey* acknowledged that a prohibition on "face-to-face solicitations, *particularly by sitting judges*," *id*. at 205 (emphasis added), tested that interpretation, but found it unnecessary to decide whether such a ban could pass muster, because the Kentucky provision at issue also prohibited a range of other solicitations. *Id*.

The appellees' argument here boils down to this: The Minnesota rules forbid a judicial candidate to learn who makes contributions to his campaign committee. If the candidate is permitted to solicit funds personally, then he will find out who has contributed and how much, and who has declined to contribute. A ban on solicitation is thus necessary to further a compelling government interest in protecting against judges who are biased in favor of campaign contributors or against non-contributors, or an appearance of such bias. The appellees' *amici* add that "there is no way to have meaningful campaign solicitations where a candidate can freely solicit contributions in one-on-one meetings with prospective donors without a substantial likelihood of learning, at least in many instances, the outcome of the 'ask.'" Brief of *Amici Curiae* Former Governor and Chief Justices in Support of Petition for Rehearing En Banc, at 3.

The personal solicitation clause is not narrowly tailored to advance the asserted government interests. The prohibition is *not* limited to solicitation by sitting judges, so it is not narrowly tailored to prevent an asserted interest in the abuse of judicial office. *See White I*, 536 U.S. at 796 (Kennedy, J., concurring). The appellees' case, rather, hinges on the assumption that a judicial candidate who personally solicits funds will learn who has contributed and how much, and then develop a bias or perceived bias as a result. The parties debate whether a judicial candidate is likely to learn through other means who contributed to his campaign. The answer to that question is not dispositive, however, because either way, the personal solicitation ban cannot withstand strict scrutiny.

There is good reason to doubt the effectiveness of the Minnesota rules that are designed to prevent judges from learning the identities of contributors. Information about contributors is a matter of public record, available on the Internet. It is hard to believe that a vigilant press would not report the fact that a party appearing before a particular judge was a financial contributor to the judge's campaign. And judges are not forbidden to read the news. *See Republican Party of Minn. v. White*, 416 F.3d

738, 765 n.16 (8th Cir. 2005) (en banc) ("*White II*"). There are other practical considerations. If the small town law firm in a remote corner of Minnesota does battle before the local trial judge against a big city law firm, is there really much mystery about which law firm likely contributed to the trial judge's campaign? If judges are likely to learn or surmise the identities of contributors through open sources or simple deduction, then the appellees' primary rationale for the personal solicitation clause is nullified, and the clause is substantially underinclusive. *See Carey*, 614 F.3d at 205.

On the other hand, if only definitive knowledge of contributors is relevant, and Minnesota's rules are truly effective, then the rules prevent the judicial candidate from acquiring the information that supposedly justifies the ban on personal solicitations. The rules forbid a candidate personally to accept a contribution after a personal solicitation, 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(6), and a candidate must direct his campaign committee not to disclose to the candidate the identities of campaign contributors or solicited persons who refuse to contribute. *Id*., Rule 4.4(B)(3). These provisions are not challenged. Under the unchallenged rules, therefore, the most that a judicial candidate could possibly learn as the result of a one-on-one personal solicitation is that a prospective donor has made an unenforceable and unverifiable statement of present intention to contribute or not to contribute. Whether the prospective donor follows through on any statement of present intention is unknown to the candidate.

Even the premise of the appellees' argument, moreover, is unsupported. It is largely speculative to assume that homeowners who answer a knock on the door by a judicial candidate will typically volunteer a decision about whether to contribute. The rule forbids personal solicitation even by a judicial candidate who expressly requests that the solicited person respond only by mail to the candidate's campaign committee. Assuming the candidate does request a reply in person, people say all sorts of things to doorway solicitors: "I will think it over." "I need to talk to my

spouse." "I gave at the office." The most that the appellees' *amici* are prepared to assert (and this despite no apparent personal experience with making one-on-one personal solicitations in a judicial campaign) is that there is a "substantial likelihood" in "many instances" that the solicited person will offer a response. And that is only with respect to one-on-one solicitations. The personal solicitation clause is not so limited. It also forbids one-on-nineteen and one-on-eighteen and one-on-seventeen solicitations, and the appellees offer nothing to suggest that a group of nineteen hearing a pitch at the local coffee shop is likely to volunteer its intentions to a candidate. If the appellees were genuinely concerned with one-on-one solicitations, then they could have fashioned a rule aimed directly at the perceived danger. That they chose, in the wake of *White II*, to prohibit solicitations of groups of nineteen suggests that the appellees simply wish to restrict solicitation as much as the courts will permit.

The appellees also ignore again the message of *Caperton* and Justice Kennedy's concurrence in *White I* that the States are free to adopt recusal standards that are more rigorous than due process requires. They argue primarily that motions to disqualify rarely succeed under *current rules*. But if the appellees are concerned that judges will be biased or apparently biased in favor of contributors or against non-contributors, then they can implement rules that require recusal when certain contributors appear before the judge, or on motion of a solicited person who has declined to contribute. This approach would avoid infringing on First Amendment rights, eliminate the asserted bias and appearance of bias, and remove any potential for coercion of prospective donors, who could be assured that the judicial candidate will never preside over a solicited person's case. *See, e.g.*, Genelle I. Belmas & Jason M. Shepard, *Speaking from the Bench: Judicial Campaigns, Judges' Speech, and The First Amendment*, 58 Drake L. Rev. 709, 734 (2010) (suggesting a set of recusal standards, and arguing that "this is a better approach than attempting to stifle either judges' or donors' speech rights"); John Copeland Nagle, *The Recusal Alternative to Campaign Finance Legislation*, 37 Harv. J. on Legis. 69, 83-84, 90 (2000)

(suggesting a legislative recusal requirement that "prevents both corruption and appearance of corruption" and "avoids the First Amendment problems posed by restrictions on campaign contributions and expenditures," and arguing that "[i]f the popular perception of the corrupting influence of campaign contributions is correct, then the appropriate response is to extend the recusal requirement to the judicial context"). There is some inconvenience in managing a broader recusal rule, but this is a First Amendment case in which strict scrutiny applies. The State may not opt to prohibit political speech when there is a less drastic alternative available, even if that alternative creates some manageable administrative burdens.

*      *      *

The Framers of the Federal Constitution designed a system for federal judges in which the appointing authorities are politically accountable to the people, but in which judges are granted protections on tenure and compensation in order to promote judicial independence. *See The Federalist Nos. 76-79* (Alexander Hamilton). As Justice Kennedy observed in *White I*, "[t]here is general consensus that the design of the Federal Constitution, including lifetime tenure and appointment by nomination and confirmation, has preserved the independence of the Federal Judiciary." 536 U.S. at 795 (Kennedy, J., concurring). But Minnesota is free to adopt a different system, and the people of Minnesota have not seen fit to implement the federal model. Having made its choice for judicial elections, the State is constrained by the constitutional rule that content-based restrictions on speech of judicial candidates must, at a minimum, withstand strict scrutiny under the First Amendment. The endorsement clause and the personal solicitation clause do not pass this demanding test, and I would reverse the judgment of the district court in relevant part.

_____